ERNEST THIBAULT, APPELLANT
FROM DECREE OF PROBATE
*vs.*
ESTATE OF ALBERT W. FORTIN

Androscoggin.   Opinion, May 11, 1956.

*Frank Coffin,*
*William D. Hathaway,* for proponents.

*Clifford & Clifford,* for contestants.

SITTING: FELLOWS, C. J., WEBBER, BELIVEAU, TAPLEY, CLARKE, JJ.   WILLIAMSON, J., did not sit.

TAPLEY, J.   On exceptions.   Albert W. Fortin, late of Lewiston, Maine, died on the nineteenth day of August, 1952.   His will was presented for probate to the Probate Court for the County of Androscoggin and, upon hearing, the Judge of Probate entered a decree disallowing the will. The proponent of the will appealed to the Superior Court

sitting as the Supreme Court of Probate. The Supreme Court of Probate, after hearing, disallowed and dismissed the appeal and approved and affirmed the decree of the Judge of Probate denying the petition for the probate of the will and remanded the cause to the Probate Court for the County of Androscoggin for further proceedings not inconsistent with the decree. The proponent took exceptions to the findings and rulings of the presiding justice who heard the case without intervention of a jury. The proponent also took exceptions to the admission of certain testimony but this exception was waived and, therefore, it will not be considered.

The justice sitting in the Supreme Court of Probate, in his opinion, says:

> "this Court finds that the instrument herein presented for probate was in fact procured by the petitioner under misrepresentations, and that said instrument is not the free will of the decedent, but was executed by the decedent by reason of undue influence exerted by the petitioner upon the decedent."

The proponent in his exceptions attacks the justice's findings by alleging that there was no evidence to support them.

Albert W. Fortin was a man 78 years of age and at the time of the execution of his will was bedridden, suffering from paralysis of the left side. The will was executed on June 25, 1952 and on the nineteenth day of August, 1952 Mr. Fortin died. The pertinent paragraphs of the will read as follows:

> "FIRST:  I hereby devise and bequeath all property, real, personal or mixed, of which I may die possessed, to my brother-in-law, ERNEST THIBAULT, his heirs and assigns forever, to dispose of the

same, in his sole discretion, as he may think fitting and proper.

SECOND: I purposely omit any of my relatives as I trust implicitely (sic) my said brother-in-law, Ernest Thibault, to dispose of my estate at his discretion."

Ernest Thibault was named sole executor of the will without bond. There are no contentions that the testator was of unsound mind.

The justice below was required to determine if the will was executed as a result of misrepresentation and undue influence. The contestants assert the claim that Ernest Thibault exerted such undue influence on the testator, Mr. Fortin, that the will which Mr. Fortin executed was not the result of a free mind and it gave Mr. Thibault a beneficial interest in the estate which Mr. Fortin did not intend he should have. This claim is most strenuously denied by the proponent. According to the terms of the will, Mr. Thibault is the sole beneficiary, if he so elects, as there is no legal compulsion requiring him to share the estate with any one.

*Rogers, Applt.,* 123 Me. 459, at page 461:

"By undue influence in this class of cases is meant influence, in connection with the execution of the will and operating at the time the will is made, amounting to moral coercion, destroying free agency, or importunity which could not be resisted, so that the testator, unable to withstand the influence, or too weak to resist it, was constrained to do that which was not his actual will but against it."

*In re Will of Ruth Cox,* 139 Me. 261, at page 272:

"As has been often reiterated, the burden of proof is on the party alleging undue influence. The true test is the effect on the testator's volition. It must be sufficient to overcome free agency, so that what is done is not according to the wish and judgment of the testator."

Mr. Thibault was the brother-in-law and close friend of the testator, as well as being the conservator of his estate. The testimony and the wording of the will demonstrate the faith and confidence which he, the testator, had in Ernest Thibault. This relationship would naturally place Mr. Thibault in such a position of trust that his acts and participation in the drafting of the testator's will should be most carefully scrutinized. It is under such circumstances and relationship that undue influence could most easily be exerted.

*O'Brien, Applt.*, 100 Me. 156, at page 168:

> "It is true, as argued, that great secrecy was observed by Mrs. Campbell and the proponent. No one had any knowledge in regard to the provisions of the will, and no one, except those who were obliged to, the scrivener and the witnesses, that she was making a will at all. It is undoubtedly true that where a will is made under such circumstances, and where a person who is largely benefitted (sic) by its provisions has much to do with its preparation, suspicion is naturally aroused, and all of the facts and circumstances surrounding the making of the will should be scrutinized with jealous care."

The contestant has the burden of establishing undue influence. *Pliny Crockett, Applt.*, 147 Me. 173.

Albert Fortin at the time of the execution of the will was physically unable to leave his bed. Mr. Thibault contacted Hercules E. Belleau, an attorney practicing in Lewiston, and requested him to draft a will for Mr. Fortin. Mr. Belleau testified:

> "Q. Now you prepared a will in accordance with Mr. Thibault's instruction?
>
> A. I did.
>
> Q. What were those instructions as you remember?

A. The instructions were that Mr. Fortin left everything that he owned to Ernest Thibault to have and dispose of in his own way.

Q. That was the will you drew up?

A. That is right."

After the will was drafted Attorney Belleau, in company with Mr. Thibault, went to the apartment of Mr. Fortin where he was introduced for the first time to Mr. Fortin by Mr. Thibault. Mr. Belleau had with him for execution the declination of Mr. Fortin's appointment as executor of his wife's will and a petition for the appointment of Mr. Thibault as administrator with the will annexed of the wife's will. These latter documents were executed before the will. The signatures were in the form of crosses. Mr. Belleau testified that he had prepared a will in accordance with the instructions given to him by Mr. Thibault. The will was read to Mr. Fortin and he said that it was all right. Mr. Belleau signed the will as a witness as did Jeanne Marquis, a neighbor, and Alma Gastonguay, Mr. Fortin's housekeeper and nurse.

Alma Gastonguay testified as to the relationship between Mr. Fortin and Mr. Thibault and then gave her version of the circumstances surrounding the execution of the will. She tells of Mr. Belleau and Mr. Thibault coming to the home on June 25th and that they went directly to Mr. Fortin's room and when they went into the room she stayed at the door until she was called to sign the will as a witness. According to the record, Mrs. Gastonguay testified as follows:

"Q. How long was it before you went to the room?

A. I stayed in the door.

Q. All the time?

A. Until the time he called me to have me sign.

Q. Had you stayed all the time in the door after they passed you?

A. When I went back it was to give them a chance to get by. They went in; then I went back to the door.

Q. What happened to the dishes all this time?

A. Stayed in the sink.

Q. In other words, you were curious?

A. Well, I was curious because things were done so quickly. They walked right in. Mr. Belleau went right to the bed. The old man was sleeping.

Q. Will you tell everything you know from this point on?

A. From then on he went into the room and saw the old gentleman. He put himself beside the bed. He had the paper in his hand. He took the paper in one hand and with the other hand took the pen and put it in the old gentleman's hand and then he took his hand and made the cross.

Q. Mr. Fortin was sleeping all during this time?

A. He took the pen away from him and it was then the old gentleman opened up his eyes and looked at him.

Q. What happened then?

A. Then he took the paper and put it on the small table by the side of the bed; said come up and sign here. I asked him 'Why do I sign that?' He said it was his will.

Q. Who said that?

A. Mr. Belleau."

Mrs. Gastonguay witnessed the will and then the question arose as to another witness, whereupon Mrs. Gastonguay requested a neighbor, Mrs. Marquis, to come to the apartment to act as a witness. While waiting for the arrival of Mrs. Marquis some conversation took place in Mr. Fortin's

room. This conversation, according to Mrs. Gastonguay's testimony, was:

"Q. How long did you have to wait for Mrs. Marquis? How long did it take for Mrs. Marquis to come over?

A. Perhaps seven or eight minutes.

Q. What went on in that seven or eight minutes?

A. It was there that he told Ernest. Ernest told him about it was his will. He told Ernest 'I leave everything in your hands so long as you divide it in equal shares between the nephews and nieces, and don't forget Mrs. Gastonguay.'

Q. Did he indicate what share you were to get?

A. He said 'Don't forget Mrs. Gastonguay. She closes both our eyes; she deserves just as much as any nephew or niece, even more.'

Q. Did he tell Ernest that you should get more than any niece or nephew?

A. As much as any nephew or niece, even more.

Q. Did he indicate how much more?

A. No. He repeated it a second time because he figures there is no answer. He didn't have any answer so he repeated the same thing.

Q. Did he get an answer?

A. He didn't get any answer. The third time he raised his voice and he says 'Did you understand Ernest? Don't forget Mrs. Gastonguay.' He said the same thing 'She deserves even more than anyone, nephews or nieces.'

Q. The second time that he spoke did he say to Ernest 'Did you hear what I said; don't forget Mrs. Gastonguay'?
Is that all he said the second time?

A. 'She deserves as much as any nephews or nieces, even more.' The third time he only mentioned myself; he didn't say anything about nephews or nieces."

It is readily seen that the testimony of Mr. Belleau and Mrs. Gastonguay concerning the circumstances attendant to the signing of the will is amazingly different.

There is presented a most important factual question between these two witnesses as to where the truth lies. According to the testimony of Mr. Belleau the testator realized the act of execution, was informed of the contents of the will and was given explanation as to the legal significance of the words used in the will. On the other hand, Mrs. Gastonguay stated that Mr. Fortin affixed his cross to the instrument while under the influence of sleep and without information of contents or explanation of their legal effect.

A reader of the record will find many inconsistencies in the testimony of various witnesses requiring the determination of facts on the part of the justice presiding. It is not for us to substitute our judgment for that of the justice below in evaluating the credibility of witnesses.
*Sanfacon* v. *Gagnon,* 132 Me. 111, at page 113:

> "He is the exclusive judge of the credibility of witnesses and the weight of evidence, and only when he finds facts without evidence or contrary to the only conclusion which may be drawn from the evidence is there any error of law."

*See Waning, Applt.,* 151 Me. 239.

There is evidence to be found that the testator, having confidence in Mr. Thibault, desired him after this, the testator's, death to take care of his affairs and business and what remained should be given to his nephews and nieces.

The record in the case plainly establishes the fact that there is substantial evidence to support the findings of the Justice of the Supreme Court of Probate.

*Waning, Applt., supra,* at page 252:

> "The rule is firmly established that upon exceptions to findings of the sitting Justice in the Supreme Court of Probate upon questions of fact, if there

is any substantial evidence to support the findings, the exceptions must be overruled. \*\*\*\*

The findings of a Justice of the Supreme Court of Probate in matters of fact, are conclusive, if there is any evidence to support them. It is only when he finds facts without evidence that his finding is an exceptionable error in law."

*In Re Simmons,* 136 Me. 451; *Appeal of Packard,* 120 Me. 556.

*Exceptions overruled.*