167 A.2d 571 (1960)
In re DILIOS' WILL.
Appeal of CASCO BANK & TRUST CO., from Decree of Judge of Probate in re: disapproval and disallowance of last will of Christos Dilios.
Appeal of Bertha TOMUSCHAT, from Decree of Judge of Probate in re: disapproval and disallowance of last will of Christos Dilios.
Supreme Judicial Court of Maine.
November 30, 1960.
*572 Bernstein & Bernstein, Portland, for plaintiff.
Jacob Agger, Robert C. Robinson, Arthur A. Peabody, Portland, for defendant.
Before WILLIAMSON, C. J., and WEBBER, TAPLEY, SULLIVAN, DUBORD, and SIDDALL, JJ.
DUBORD, Justice.
These two cases which were tried together in the Probate Court within and for the County of Cumberland and before the Supreme Court of Probate, are before us to be heard together, upon exceptions filed by the Casco Bank & Trust Company and Bertha Tomuschat, to the findings of the Superior Court sitting as the Supreme Court of Probate for the County of Cumberland holding the will of Christos Dilios, late of Portland, Maine, as invalid because of undue influence and mistake.
Christos Dilios died on June 27, 1958. An instrument dated and executed by him on March 14, 1958 was presented in the Probate Court within and for the County of Cumberland as and for his last will and testament. In this purported will, he named the Casco Bank & Trust Company and Israel Bernstein, a Portland attorney, as joint executors.
By decree dated April 7, 1959, the will was disallowed by the Probate Court within and for the County of Cumberland. This order was entered without the filing of any opinion or expressing any legal reason for the action taken.
An appeal from this decree was filed by the Casco Bank & Trust Company to the Supreme Court of Probate. Bertha Tomuschat, a beneficiary named in the aforesaid purported will, filed a similar appeal.
Both appeals were heard together and on August 28, 1959 the sitting justice of the Superior Court, acting as the Supreme Court of Probate, filed decrees in both cases in which it was ruled that the testator, at the time of the execution of the purported will was in possession of mental capacity sufficient to execute a will, but the appeal was dismissed and the purported will held invalid, because of undue influence and mistake.
To these findings, the proponents filed their exceptions.
The issues for our determination are as follows:
(1) Was the instrument purporting to be the last will and testament of Christos Dilios procured by undue influence?
(2) Was this instrument executed by Christos Dilios under mistake and misunderstanding as to its composition?
The proponents maintain that the execution of the instrument in question was not the result of undue influence and that there was no mistake or misunderstanding on the part of the testator. These assertions are denied by the appellees and to the aforesaid issues, the appellees advance the additional argument that the findings of the Justice of the Supreme Court of Probate should not be disturbed, for the reason that such findings can be attacked only for errors of law or for abuse of *573 judicial discretion, and that such findings are conclusive if there is any evidence to support them. Appellees contend that no such error or abuse is shown and that there was sufficient evidence to support the findings.
We start out with the premise, of course, that an instrument purporting to be a last will and testament obtained by undue influence is void; and likewise, that a mistake which defeats the intention of a testator is sufficient to invalidate a purported will.
We turn our attention, therefore, to what constitutes undue influence such as to invalidate a purported will and the burden of proof when an instrument purporting to be a last will and testament is contested on the grounds that it was obtained by undue influence.
That the burden of proof of undue influence rests upon the party asserting it has been frequently asserted by this court. Barnes v. Barnes, 66 Me. 286, Chandler Will Case, 102 Me. 72, 66 A. 215, Norton et al., Applts., 116 Me. 370, 102 A. 73, Hiltz, Applt., 130 Me. 243, 154 A. 645, Thibault, Applt., 152 Me. 59, 122 A.2d 545; Royal et al., Applts., 152 Me. 242, 127 A.2d 484.
Now, what of the nature of the influence which can be construed as undue and thus invalidate a purported will?
Undue influence such as will invalidate a will has been found not too easy to define with precision.
"As applied to a will contest, undue influence has reference to the means and methods resorted to and employed by a person for the purpose of affecting and overcoming, and which ultimately do affect and overcome, the free and unrestrained will of a testator. Concisely stated, undue influence invalidating a will is that which substitutes the wishes of another for those of the testator. Although it has often been stated that undue influence is an unlawful influence, it appears that no more is meant by the expression `unlawful influence,' as used in this connection, than that it is the influence which deprives the testator of his free agency." 57 Am. Jur., Wills, § 350.
"The different definitions which have been suggested for undue influence are substantially alike in the idea involved, and differ only because in part of difference in expressing the same idea, and in part because of a difference in the standpoint from which the idea of undue influence is viewed. In some cases the idea of coercion is emphasized. It is said to be influence which `amounts to moral or physical coercion so that the testatrix was prevented from exercising her own judgment and free will and that her act became, in effect, that of another,' or `imprisonment of mind or body.' The use of the term coercion is not meant to limit undue influence to physical force or threats of physical force. Any pressure upon testator's mind, which overpowers it, is coercion in this sense. The fact that it is not physical coercion is sometimes indicated by calling it moral coercion.
"Emphasis is also laid on the idea that in undue influence, testator's free agency is destroyed. It is influence `such as in some measure destroys the free agency of testator and prevents the exercise of that discretion which the law requires that a party should possess.' His loss of free agency is such that he is compelled to make a will which he would not have made if he had been left to the free exercise of his own judgment and wishes.
"Undue influence exists only when the will power of the testator is destroyed, and his own will is borne down. His freedom of will must be so destroyed as to substitute the will of another for his own. Undue influence exists *574 when `testator's volition at the time of testamentary act was controlled by another and * * * the will was not the result of the free exercise of judgment and choice.' It consists of `a pressure which overpowered the mind and bore down the volition of testator at the very time the will was made.' Undue influence is that ascendency which prevents testator from exercising his unbiased judgment. It is `any improper or wrongful constraint, machination or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not have done or foreborn had he been left to act freely.' It deprives testator of his usual volition, so that his will is not free and unconstrained, and his act in executing the will is not voluntary." Page on Wills, Vol. 1, § 183.
"Upon the other hand, whatever may be the nature and extent of the influence, if, because of the physical or mental weakness of the testator, and the nature and persistency of the influence exerted, it is such that the testator is unable to resist it, if it deprives him of his power to act as a free agent in the manner that he otherwise would, it is sufficient to avoid the will, because a will made under such circumstances is not the will, and does not carry out the wishes, of a capable testator, acting as a free agent. It follows that the true test is to be found, not so much in the nature and extent of the influence exercised, as in the effect that such influence has upon the person who is making his will.
"Whatever the nature and extent of the influence exercised, if in fact it is sufficient to overcome the volition and free agency of the testator, so that he does that which is not in accordance with the dictates of his own judgment and wish, and what he would not have done except for the influence exerted, it is undue influence." O'Brien, Appellant, 100 Me. 156, 158, 60 A. 880, 881.
"By undue influence in this class of cases is meant influence in connection with the execution of the will and operating at the time the will is made, amounting to moral coercion, destroying free agency, or importunity which could not be resisted, so that the testator, unable to withstand the influence, or too weak to resist it, was constrained to do that which was not his actual will but against it.
"Undue influence often closely resembles and is near akin to actual fraud. But strictly speaking it is not synonymous with fraud. In the making of a will, undue influence is exerted where the mind of the nominal maker of the document, in yielding to the dominancy and supervision of another's designing mind, does what otherwise the ostensible actor would not have done. Undue and improper influence, to go a little further, presupposes testamentary capacity. Were there no capacity, there could be no will, and the question of whether or not there was influence would be an idle one. The strength of the person's will, in connection with other facts, may be material in relation to whether an exerted influence became operative, but total incapacity negatives the very suggestion of the influence. The influence must arise either from proof or presumption of law. It is never inferred from mere opportunity or interest, though these facts if shown should weigh with other facts." Rogers, Appellant, 123 Me. 459, 461, 123 A. 634, 636.
See also Royal et al., Appellant, 152 Me. 242, 250, 127 A.2d 484.
"As has been often reiterated, the burden of proof is on the party alleging undue influence. The true test is the effect on the testator's volition. It must be sufficient to overcome free agency, so that what is done is not *575 according to the wish and judgment of the testator." In re Will of Cox, 139 Me. 261, 272, 29 A.2d 281, 286.
The nature of the undue influence that will vitiate an alleged will was elaborately considered in an opinion by Chief Justice Rugg in Neill v. Brackett, 234 Mass. 367, 126 N.E. 93, 94. Here the court said:
"Fraud and undue influence in this connection mean whatever destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammelled desire. It may be caused by physical force, by duress, by threats, or by importunity. It may arise from persistent and unrelaxing efforts in the establishment or maintenance of conditions intolerable to the particular individual. It may result from more subtle conduct designed to create an irresistible ascendancy by imperceptible means. It may be exerted either by deceptive devices or by material compulsion without actual fraud. Any species of coercion, whether physical, mental or moral, which subverts the sound judgment and genuine desire of the individual, is enough to constitute undue influence. Its extent or degree is inconsequential so long as it is sufficient to substitute the dominating purpose of another for the free expression of the wishes of the person signing the instrument. Any influence to be unlawful must overcome the free will and eliminate unconstrained action. The nature of fraud and undue influence is such that they often work in veiled and secret ways. The power of a strong will over an irresolute character or one weakened by disease, overindulgence or age may be manifest although not shown by gross or palpable instrumentalities. Undue influence may be inferred from the nature of the testamentary provisions accompanied by questionable conditions, as for example when disproportionate gifts or benefactions to strangers are made under unusual circumstances. When the donor is enfeebled by age or disease, although not reaching to unsoundness of mind, and the relation between the parties is fiduciary or intimate, the transaction ordinarily is subject to careful scrutiny. In such an inquiry all the attributes, sensuous, intellectual, ethical and religious, of the individuals concerned are involved. Strength or infirmity of will, natural and cultivated tastes and temperament, and tendencies to passion, resentment, obstinacy, prejudice and calm, all are elements to be considered. A strong sense of justice, determination and steadfastness of purpose are significant considerations, as are also a spirit of domination, persistent desire to rule, and deep-seated selfishness. Age, weakness and disease are always important factors. Relations of intimacy, confidence and affection in combination with other circumstances are entitled to weight. * * *
"Fraud or undue influence, such as if found to have been exercised, invalidates a will, may be manifested in divers ways. It is not practicable or desirable to attempt to lay down any hard and fast rule. Whatever may be the particular form, however, in all cases of this character three factors are implied: (1) A person who can be influenced, (2) the fact of deception practiced or improper influence exerted, (3) submission to the overmastering effect of such unlawful conduct." Neill v. Brackett, supra.
See also Aldrich v. Aldrich, 215 Mass. 164, 102 N.E. 487, 489; and Morin v. Morin, 332 Mass. 223, 124 N.E.2d 251.
A search, which may perhaps not be exhaustive, fails to disclose any decisions of this court exactly on the issue of whether or not undue influence must be proved by direct evidence or may be established by inferences created by circumstantial evidence. However, there are many decisions in other jurisdictions holding *576 that direct proof is not necessary, albeit it is held that the inference must amount to more than mere suspicion or conjecture.
"The exercise of undue influence may be shown by circumstantial evidence, and the provisions of the will, and the circumstances attending its execution, may be sufficient to warrant a finding against its validity, but it is not correct to say that a mere showing of such circumstances, even in the absence of an explanation by the party implicated, creates a presumption of law that the will is invalid, and that the court might thereupon so instruct the jury. This question, like others in issue, must be left to the determination of the jury in the exercise of their sound judgment, after weighing all the facts and circumstances given in evidence." Friedersdorf v. Lacy, 173 Ind. 429, 90 N.E. 766, 769.
"Mere suspicion, however strong, is not of itself enough to warrant a finding of fraud and undue influence. On the other hand, it is not necessary that there should be direct evidence of fraud and undue influence in order to justify such a finding, though it often happens that such evidence is produced. It is of the nature of fraud and undue influence that they may be exercised in indirect and underhanded ways difficult to be come at, and to be judged of only by their results. The will of a testator may be coerced and fraud committed upon him in various ways, and what would constitute fraud and coercion in one case, might not in another. There is no hard and fast rule. A person may be so situated, so weak and feeble or so dependent on another, for instance that mere talking to him or pressing a matter upon him would so affect him, that, for the sake of quietness, he might do that which he did not want to do, and which, if his health had been better or his will stronger, he would not have done. Such a case would constitute or might be found to constitute coercion as truly as force or duress." Hoffman v. Hoffman, 192 Mass. 416, 78 N.E. 492, 493.
"Undue influence need not be proved by direct evidence but may be inferred from attendant circumstances, though there must be more than mere suspicion." Mirick v. Phelps, 297 Mass. 250, 8 N.E.2d 749, 751.
"The sufficiency of the evidence to sustain a verdict on appeal depends solely on the presence in the record of some competent evidence which tends to support that verdict." Davis v. Babb, 190 Ind. 173, 125 N.E. 403, 405.
"In determining whether the evidence is sufficient to sustain the verdict of the jury, this court will consider, not only the positive testimony of the witnesses, but also such inferences as flow naturally from established facts." Davis v. Babb, supra.
"Undue influence need not be proven by direct and positive evidence, but it may be inferred from or shown by the facts and circumstances in evidence. Nor is it necessary that the overt acts of undue influence should have been exercised at the exact time of the execution of the will and codicil, but it is sufficient to show that such influence over the mind of the testator had been acquired previously and did operate at the time the will and codicil were made." Davis v. Babb, supra.
"In the contest of a will on the ground of undue influence the evidence required to establish the undue influence need not be of that direct, affirmative, and positive character which is required to establish a tangible physical fact. The only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonably inferred." Davis v. Babb, supra.
"Undue influence need not be proven by direct and positive testimony, but it *577 is sufficient if it is shown by, or can be inferred from, the facts and circumstances in evidence." Mowry v. Norman, 204 Mo. 173, 103 S.W. 15, 20.
"Nor is it required that the overt acts of undue influence were exercised at the exact time of the execution of the will, but it is sufficient to show that such influence over the mind of the testator had been acquired previously and did operate at the time of making the will in the disposition of the testator's property." Mowry v. Norman, supra.
"It is not necessary that there be direct proof of fraud or undue influence." Duckett v. Duckett, 77 U.S.App.D.C. 303, 134 F.2d 527, 528.
"Undue influence may be established by circumstantial evidence." In re Eiker's Estate, 233 Iowa 315, 6 N.W. 2d 318, 320.
"Whenever issues of duress, undue influence, fraud, and good faith are raised, the evidence must take a rather wide range and may embrace all the facts and circumstances which go to make up the transaction, disclose its true character, explain the acts of the parties, and throw light on their objects and intentions.
"Such matters are ordinarily not the subject of direct proof, but to be inferred from the circumstances, and in all such cases, great latitude of proof is allowed and every fact or circumstance from which a legal inference of the fact in issue may be drawn is competent." 20 Am.Jur., Evidence § 345.
Although the point does not appear to have been discussed in any opinion of this court, in other jurisdictions it has been determined that the one who exercises undue influence need not benefit personally as a result of such exercise.
"Undue influence exercised by any one, whether he or another gains by its exercise, renders the will or other instrument thus procured worthless." Gidley v. Gidley, 130 Neb. 419, 265 N. W. 245, 250.
"The undue influence is generally exerted by the beneficiary under the will; but this is not necessary. If undue influence is exerted by one who is not a beneficiary under the will, the will which is caused thereby is as invalid as if the influence were exerted by one of the beneficiaries." Page on Wills, Vol. I, § 190.
We have seen that undue influence can be proven by circumstantial evidence and inferences to be drawn therefrom. Now, what is circumstantial evidence? Section 270, 20 Am.Jur., Evidence, defines it as follows:
"The basic distinction between direct and circumstantial evidence is that in the former instance the witnesses testify directly of their own knowledge as to the main facts to be proved, while in the latter case proof is given of facts and circumstances from which the jury may infer other connected facts which reasonably follow, according to the common experience of mankind. Circumstantial evidence tells the story of a past transaction by the similitude between the things shown to have been done and what in human experience has been found to be generally the cause or result of similar occurrences."
"Circumstantial evidence simply comprises the minor relative facts standing around the principal fact to be proved. To use the expressive term of the Roman law, these facts are the indicia of truth, serving to point out the object sought. They stand as silent witnesses of the main fact, continually pointing to it, and aiding to fix its true character and significance. This method of investigating truth by circumstances is often characterized as a `convergence of rays of light to a *578 common focus or center,' but more frequently as the formation of a chain out of a number of separate links. The former simile more aptly illustrates the operation of independent, and the latter of dependent, circumstances. But however figuratively expressed, the idea to be conveyed is, that several distinct circumstances, no one of which is conclusive in its nature and tendency, may be found so naturally associated with the fact in controversy and so logically connected with each other, as to acquire from the combination a weight and efficacy that will be accepted as absolutely convincing." State v. Richards, 85 Me. 252, 254, 27 A. 122, 123.
"`Circumstantial evidence' consists of proof of certain facts and circumstances from which court may infer other facts which usually and reasonably follow, according to common experience of men." Taylor v. Director of Public Works, 121 Ind.App. 650, 100 N.E.2d 831, 832.
Many definitions can be found for what is meant by a reasonable conclusion or deduction from circumstantial evidence.
"An `inference' is a conclusion which, by means of data founded upon common experience, natural reason draws from facts which are proven." State v. Nevius, 147 Ohio St. 263, 71 N.E.2d 258, 265.
"An inference is a deduction of an ultimate fact from other proved facts, which proved facts, by virtue of the common experience of man, will support but not compel such deduction." Ayers v. Woodard, 166 Ohio St. 138, 140 N.E.2d 401, 406.
So far, we have seen what undue influence such as will invalidate a will consists of, and the burden of proof in cases where an instrument purporting to be a will is contested on the grounds of undue influence. We have further seen that undue influence may be proven by circumstantial evidence and that the court hearing such a case may arrive at conclusions based upon logical inferences from such circumstantial evidence.
Now, what of the facts of this case?
Christos Dilios came to this country from Greece and became a naturalized American citizen. He went into the restaurant business and was conducting an apparently successful venture in the City of Portland, for a number of years prior to and at the time of his death.
He made and executed at different times in the later years of his life, three wills and a codicil to his first one. All of these instruments were highly complicated, due in large measure to the fact that at the time he executed his first will and codicil his entire family consisting of his wife, two sons and a daughter, were residents in the country of Albania; and at the time of the drafting of the last two instruments, his wife and daughter still remained in Albania, a country dominated by communistic influence and in which the ordinary modes of communication no longer existed. Because of this situation, the testator realized the difficulties in making provisions for distribution of money, first to his entire family, and then to his wife and daughter after the boys had managed to escape and come to this country.
The record discloses that it was the hope and ambition of the testator that his entire family might some day be able to leave Albania and emigrate to this country. His ambition and hope insofar as his wife and daughter were never realized, but after substantial expenditure of money and tireless effort on the part of the father, the two sons succeeded in escaping from Albania and in reaching this country. It was determined that they were American citizens by virtue of their father's naturalization.
The first name of the older son was Dhimitrios, and the first name of the younger *579 son was Basilios. After the boys had arrived in this country, the older son became known as James and the younger son as William.
A study of the three wills and the codicil to the first one indicates, insofar as the wife and daughter are concerned, a similar pattern relating to their rights in the estate of Christos Dilios.
The first will was dated January 29, 1954. In this instrument the Casco Bank & Trust Company and Israel Bernstein were named as executors and trustees. Among the directions and powers given to the trustees was that of carrying on the restaurant business previously conducted by the testator.
The first will did not provide for any specific legacies and it is to be noted that it makes no provision of any kind for Bertha Tomuschat.
All of the estate is given to the trustees for the benefit of the testator's wife, his daughter and his two sons. There is also a provision for some support for his sister during her lifetime. It is finally provided that if any money remains in the trust fund after the death of the last survivor, that such balance shall be divided between the Hellenic Orthodox Church of Portland, Maine, and Maine General Hospital of Portland, Maine. As indicative of his interest in his two boys, it is provided that the trustees shall have authority to expend such funds as may be necessary to enable them to come to this country and the trustees are also instructed to pay for the education of William by means of increased payments to him if necessary.
On July 11, 1956, Christos Dilios executed a codicil to his will and the substance of this change is that provision was made for the payment by the trustees of $200 per month to the older boy, and in the event the older son was unable to receive the money to the younger boy, apparently upon the theory and belief on the part of the testator that his sons would take care of the other members of the family in an appropriate manner from this monthly payment.
That the testator at this time intended that eventually either or both of his sons should have his entire estate, subject to their taking care of their mother and sister, is indicated by a provision in the codicil that at the request of either or both of the sons, the trust assets should be liquidated and the proceeds paid over to the sons in equal shares, or wholly to either of the sons, as the trustees may determine. It was further specified that if either or both of the sons should come to the United States, then upon the request of either son, the trust should be determined and the assets paid over to such son or in equal shares to the sons, if both of them were in this country. The testator expressed confidence that either or both of them would take care of the other members of the family.
Up to this point we have seen, therefore, that the testator had clearly declared his intention, albeit in a complicated manner, of making sure that his estate would be used for the benefit of his wife, daughter and two sons, and eventually be shared by the two boys.
The boys arrived in this country in the summer of 1957 and it is evident that shortly after their arrival, trouble ensued between the boys and Bertha Tomuschat, who was then, and had been for many years, a cashier in the restaurant. The evidence discloses that there was a close relationship between Bertha Tomuschat and the testator, a relationship which had existed for a long period of years. There is nothing in the case to show the marital status of Mrs. Tomuschat, but it is indicated she was the mother of a seventeen year old daughter. Of course, the testator was a married man with a wife in Albania. The two sons resented this relationship between their father and this woman.
Shortly after the arrival of the two boys, it appears that trouble developed, at first between the older boy and his father, and later between the younger boy and his father. More will be said later in this *580 opinion concerning some of the evidence and the proof which the court below had before it for consideration from the standpoint of drawing conclusions and inferences.
In any event, Christos Dilios executed a new will on December 31, 1957.
By this will, he bequeathed Bertha Tomuschat the sum of $1,000, in recognition he said, of her many years of faithful and devoted service. He then requested that his executors and trustees, and a son he did not name, continue to employ her as manager or assistant manager at a salary of not less than $40 per week. The son he had in mind must have been William because in subsequent provisions in the will he specified for eventual distribution of the restaurant to him.
In this will of December 31, 1957, he cut off his elder son, James, with a bequest of only $100. The other provisions relating to the benefits for his wife, his daughter, and his son William, are somewhat similar to those contained in the prior will and codicil.
In the will of December 31, 1957 we find the following paragraphs:
"C. Anything herein to the contrary notwithstanding, I direct that if my Trustees determine that my said son, William, is capable of managing his own affairs and the business affairs of my estate, has a sense of financial responsibility, has developed maturity and good judgment, has qualities of industriousness, honesty and sincerity, and has demonstrated proper respect and consideration for his Mother and other members of our family, then they may, in the exercise of their sole discretion, when my said son, William, has reached the age of twenty-three (23), or at any time thereafter, distribute to my said son William, free of trust, at any time and from time to time, all, or any part of, the assets forming a part of my estate and upon any such distribution or distributions, my Trustees shall determine whether the right to receive all or any part of the income herein provided for my said son, William from this estate shall be determined and ended. I expressly authorize the complete termination of this trust and the distribution of all of its net assets to my said son, William, if, in the exercise of their sole discretion, my Trustees determine that William has made appropriate commitments and arrangements to provide proper support to meet the determinable needs of his mother and sister who would otherwise be beneficiaries of this estate had it continued.
"D. Anything herein to the contrary notwithstanding, I direct that within five (5) years after the date of my death the Trustees shall, in accordance with the provisions of the foregoing Paragraph, distribute, free of trust, to my said son, William, those assets of my estate which make up the restaurant enterprise which I carried on during my lifetime, provided that my estate at that time still owns and operates said restaurant enterprise. I request, but do not direct, that my Executors and Trustees carry on my said restaurant business for such eventual distribution to my said son, William, if at all possible.
"E. Anything herein to the contrary notwithstanding, I direct that, if an opportunity arises for my said wife and my said daughter, or either of them, to come to the United States, my Trustees may, without regard to any of the other provisions of this Will and any other rights herein created, in the exercise of their sole and uncontrolled discretion use any and all of the funds of this estate to enable my said wife and daughter, or either of them, to come to the United States for the purpose of establishing a permanent residence and in the hope of eventually securing United States citizenship; and further that, if an opportunity arises for my said son, William, to *581 continue his education, my Trustees may, without regard to any of the other provisions of this will or any other rights herein created, in the exercise of their sole and uncontrolled discretion increase the payments being made to my said son, William, in such amounts and at such time or times as they shall determine, to enable my said son, William, to continue his education."
Although there are prior paragraphs providing for distribution of any balance remaining after the death or remarriage of the wife, the death of the daughter and the death of William, to the Hellenic Orthodox Church and to Maine Medical Center of Portland, Maine, it is clear from the three foregoing paragraphs that as of December 31, 1957, Christos Dilios, having cut off his older son with a bequest of only $100.00 showed an intention, first that his son, William, might eventualy receive his entire estate, and second an expectation that the trustees named in the will were to see that he received a proper education.
The will which was presented for probate, which is the subject of this case, was executed on March 14, 1958, about two and one half months after the will of December 31, 1957.
In this will he devised to Bertha Tomuschat the so-called camp property on Highland Lake in satisfaction, Dilios said, of debts owed by him to her, and conditioned upon her giving the estate an appropriate release and discharge of all the obligations incurred by him to her during his lifetime. It was further provided that she be continued as manager or assistant manager of the restaurant at not less than $40 per week.
He then gave each of his sons a legacy of $100 and this was the sole provision made for them.
After making a few specific bequests, he then made provision for the care of his wife, daughter and sister, still in Albania with bequests of any residue after the death of all beneficiaries, to the Hellenic Orthodox Church and Maine Medical Center.
We propose now to digest briefly the evidence applicable to occurrences leading up to the drafting of the will of December 1957 and the final will of March 1958.
For many years, Christos Dilios, had employed a firm of attorneys, one of whose members drafted the will. He had the utmost confidence in them and it is fair to recite at this point that there is nothing in the record which in any manner can point the finger of suspicion at these highly competent and honorable attorneys.
A study of the evidence of the scrivener indicates that the bringing of his sons to the United States by the testator was the culmination of a life long dream. Nobody, the scrivener said, could have been happier than he was when at last his two sons were here. However, the scrivener further said that after a very short period, Dilios came to him and talked to him and told him he was having serious problems, particularly with his oldest son. This was in the fall of 1957 and the boys, it will be noted, had been in this country at that time less than six months. The oldest boy the scrivener said, was causing his father terrible heartache because he had no respect for him, would not tend to business, and would not obey instructions. He told the scrivener a story of a physical beating administered by the older boy to the younger boy at the family home, at which time when the father attempted to intervene he had been struck. This story incidentally was denied by both of the boys. The scrivener said, "to make a long story short, he came to me and said that he wanted his eldest son taken out of his will." The scrivener said he advised him to go slow, but finally at the end of the year after a serious illness on the part of the testator, he informed the scrivener that he was determined to cut off the older boy. Then about a month after this will was drawn, very early in 1958, either in January or February, the testator came to the office *582 again and gave directions for the drafting of a new will in which the younger son was disinherited. The reasons attributed by the father for this change was that the younger son was siding in with his older brother. After giving definite instructions that a will be drafted, in which both sons were given only the sum of $100, the scrivener said that the testator indicated that he hoped the boys might reform in which event, he might make a new will.
Upon being asked whether or not the testator had ever told him that part of the trouble with the oldest son was because of the cashier, he replied, that the testator told him that they did not work well in the restaurant; that they did not take his instructions; and that they did not take instructions from Mrs. Tomuschat; that they were constantly doing things which disturbed him in the restaurant. He further said that he was disturbed because the older boy insisted on having social contacts with the waitresses. He also questioned the honesty of the older boy.
It is clear from some of the remaining testimony of the scrivener that much trouble had developed because of ill feeling between Mrs. Tomuschat and the boys.
The scrivener also testified that the testator informed him that Mrs. Tomuschat had mentioned to him incidents of alleged misbehavior in the restaurant on the part of the older son.
A witness, of Greek extraction, the operator of a restaurant in Biddeford, testified that he was a close friend of Christos Dilios; that he knew that Dilios had executed a will in which he disinherited his sons, because Dilios went about broaching this information to his friends. This witness testified that in a discussion with Dilios, he told Dilios he had heard he had disinherited his sons, and asked him particularly about the younger boy. To this, he said, Dilios informed him that the executors would take care of him, and there was nothing to worry about, and he discussed with him the matter of the education which should be furnished to William. He also testified regarding the relationship between Mrs. Tomuschat and the testator, and that the sons disapproved of it.
He said Dilios made this statement to him: "I have been going around with this lady 12, 13 years; taken the best years of her life. I have received something in return. I just can't put her away now because the boys come in. I am getting old, not long to live."
Upon being asked if Dilios had told him of the problems existing between the sons and the woman, he said that the boys objected to his relationship with her. Dilios informed this witness that the boys had personally indicated their objections to their father.
He further said that upon pressing Dilios for the real reason for his action of disinheritance, Dilios replied: "You know the real reason. They can't get along with the lady."
Under cross examination he repeated that Dilios stated that the younger boy was to be taken care of by his attorneys and executors. There is, of course, no provision in the last will instructing or directing the attorneys and executors to expend money for William's education, but there was such a provision for his education in a prior will.
Another witness of Greek extraction described himself as a close friend of Dilios. As a result of talks with the testator, he attributed the trouble arising over the boys as due to Mrs. Tomuschat.
Note the following testimony:
"Q. Can you tell us what Mr. Dilios told you about the trouble he had? A. Well, Mr. Dilios and I, very, very close friends, and I took authority, I says: `Why you have this kind of trouble with sons?' I says: `Your big dream to bring your sons over here to United States. You spend so much money.' *583 He says to me: `I am pleased. Don't ask me any more questions. I am in big trouble with woman.' I says: `All right. What kind of trouble? You throw your sons on street for one woman.' I says: `What is trouble? Are you married legal?' I am very, very close friend and I ask many details. He says to me: `You couldn't know, but I am big trouble. Don't ask me any more.' He started cry.
"Q. Did you know Mr. Dilios had drawn a will in 1958, sometime in March? A. That's right.
"Q. Did Mr. Dilios talk with you about the will? A. Yes.
"Q. Did he say anything about his sons in the will? A. That's right.
"Tell us what Mr. Dilios told you? A. That's right. I am going to tell Mr. Dilios told me.
"Q. You understand that. Tell us what Mr. Dilios told you. A. He told me he cut the old son, Jim, from the will, and left the whole for his wife and the small, Bill. I says: `O.K. for the old one.' I says: `How about for Bill?' He says to me: `My wife and Bill, it is all set and my lawyer is going to take care of my Bill, going to send high school'."
As to the relationship between the testator and Mrs. Tomuschat this witness testified as follows:
"Q. Whether or not you have ever seen Mr. Dilios and Mrs. Tomuschat, the cashier, together outside of the restaurant? A. So many times. Sometimes she, he give her with me ride to my tailor shop.
"Q. Were they always together? A. Together, Mrs. Shaw and Mr. Dilios together.
"Q. Was she always at camp? A. Many times, going from my tailor shop, he left his stuff and start car in my front, and I say: `Where you go?' And he says: `I am going to camp.' And Mrs. Shaw was in his car."
The record indicates that Mrs. Tomuschat was also known as Mrs. Shaw.
There was entered into the record the following testimony of this same witness given by him in the hearing in the Probate Court:
"Did you have any conversation with Mr. Dilios about his sons when they first came over here? Answer: None the first two months. They live happy, because his dream is to bring his sons to the United States. After two months he started to talk. Question: About troubles? Answer: Yes. Question: What kind of troubles? Answer: About Mr. Dilios, he live with another wife."
James Dilios testified that he arrived in this country on June 8, 1957 and he recited a story of the happiness experienced by his father.
Upon being asked whether or not he ever had any trouble with Mrs. Tomuschat in the restaurant he replied: "I did not have any trouble at the beginning when we first came over here, but we did have trouble later on, when I found out my father had relations with the woman. In other words, that my father was on a friendly basis with the woman, that was when the trouble started."
He denied ever having struck his father and said he had great respect for him. He said he had discussed with his father the relationship with Mrs. Tomuschat. He said that after a period of a few months, he realized his father was a sick man and he asked if it would be possible for him to learn the restaurant business to which his father said it would not be possible at that time because Mrs. Tomuschat did not approve of the idea of James working behind the counter and that the entire proposition would be disagreeable to her. He related an episode occurring at the restaurant *584 about Mrs. Tomuschat objecting to having him behind the counter, lost her temper with him and threw all of his clothes outside, and then telephoned his father. Upon arriving at the restaurant, the father not knowing the facts, but relying entirely upon Mrs. Tomuschat's story ordered him out of the restaurant. He then called the police and informed them that his son was making trouble in the restaurant and the police took him to headquarters. A few days later he decided to go back to the restaurant to work, but before he had a chance to begin, two police officers entered, he said as a result of a telephone call, and they took him to police headquarters again. As to accusations that he took money from the cash drawer, he said that several persons had access to the cash drawer, including Mrs. Tomuschat, and that accusations about money missing, which he says were false were made by Mrs. Tomuschat. He further testified that it was a usual occurrence for Mrs. Tomuschat to make complaints to his father on various subjects always in criticism of the boys.
In telling of the relationship between his father and Mrs. Tomuschat, he said, "knowing my father's past, and after being here 5 to 6 months and seeing the very close relationship that my father had with this woman, and realizing every day we were being driven farther and farther apart from one another, my brother, and especially myself, I sat down to have a mind, to talk with him."
He then said that as a result of this talk which he instituted, an argument developed with his father.
"Q. Will you tell us in your own words, what the argument was between you and your father in 1957? A. I asked my father to tell me everything that had happened up to December, 1957, and by asking him that question, my father was deeply hurt. However, I went on and asked my father to explain the situation and to straighten out before things developed into a worse mess than what they already had been into.
"Q. Are you through? A. From that moment on, my father sort of withdrew himself from me. However, I continued and told him to stop going to this woman's house every day. My father told me he was sick and he had to have someone to take care of him. However, in return, I told him that he had two sons who could take care of him if he was sick. I did not ask my father to fire this woman from the restaurant. I simply asked him to tell this woman not to infringe on us all the time, not to find certain things that she would throw the blame on, that is, concerning us. My father, in return, told me that: `I could not tell her anything because I have been with her for a good many years. If I told her anything to that effect, she would get very mad.'"
William Dilios, the younger boy testified as follows:
"Q. Ever have any fights with your father? A. No, I didn't never.
"Q. Ever have any discussion with him about any woman? A. Yes, I did.
"Q. Have any discussion about the cashier? A. Yes, especially.
"Q. Can you tell us about that? A. When we first came here, we are from different country. We didn't know the language. We couldn't understand many things first days, but we saw plenty. We saw father, when we came, introduce us everybody in restaurant and to that lady to say: `Here is my cashier.' We were, we have respect for everybody, to her. After a little while, we saw things different. We saw father to act different, go in her house, to go out with her, go and came with her, we saw father sit and wait for her to come in restaurant, *585 to eat together. I ask my brother what is going on here. He explain to us this, my brother, after I went in, told father what I told him. Father come and said: `I know what I am doing. You are too young.' I kept quiet."
He then relates a story of increasing trouble fanned by arguments between the older boy and his father.
He testified that Mrs. Tomuschat accused him and his brother "about everything happen in the restaurant." He said, these accusations were made to his father.
He denied that his brother ever struck their father. While the testimony is somewhat confused because of lack of knowledge of the English language, it appears that his father was either taken sick at Mrs. Tomuschat's home or died there and William was not notified of his father's death until several hours later.
In describing arguments with his father, he said:
"Q. Had arguments with your father? A. We had arguments.
"Q. About what? A. About the lady and about the things happen about her. That was the conversation every day.
"Q. Did he come back to you and complain to you and tell you she complained to him about what you did in the restaurant? A. Yes.
"Q. Did you admit that you did these things in the restaurant? A. Yes. He was so close to her; he was so scare from her, he couldn't see in front of her nothing."
Mrs. Tomuschat was called as a witness, but her testimony was very brief. She was not asked to explain her marital status, but said she had been employed in this restaurant since 1943, having first started to work for the predecessor of Dilios. She denied having trouble with the boys. Upon being asked whether or not Dilios had trouble with the boys, she said, because she could not understand Greek, she did not know what he was saying to them. She was evasive in her answers regarding arguments between the father and the sons and said he did not discuss with her what took place at his home. She denied having any arguments with either or both of the boys and said that no problems existed. Upon being asked whether or not Dilios was indebted to her, she said:
"Well, it is hard to say how it was. I never kept track. Sometimes he borrowed some from me when he was short, a lot of times. I worked a lot of over time and never got paid for it.
"Q. At the time of his death, you have any indication of the amount? A. I have no record of it.
"Q. As far as you are concerned, he owed you nothing? A. Just from my working there, and working the way I did.
"Q. Would you hazard a guess as to what you feel he owed you for money? A. No, I will not guess."
The testimony of the Portland Chief of Police, called as a rebuttal witness by the appellants is of interest. It seems he says he became rather friendly with Dilios late in 1957. This friendship or relationship started as a result of the fact that the wife of the Police Chief was in the hospital for a period of over three months beginning November 1957 and that because of convenience, the Chief ate his noon meal at the restaurant. He relates conversations with the testator in particular reference to alleged troubles with his sons and it is to be noted that these conversations began in November and December, just before the time the new will was drafted. It appears that shortly after the beginning of the year 1958, Dilios requested that the police officer on the beat early in the morning be on hand as the father anticipated trouble with the older boy. Note that this is immediately after the execution of the will of December 31.
*586 He said that Dilios had informed him of an incident where the older boy took a bed post and struck the younger boy with it. Such a story hardly seems reasonable as it is difficult to conceive how a bed post could be extracted from a bed. Moreover, the Chief admitted that upon one of the trips when James was taken to police headquarters, his father did not accuse him of beating up his younger brother. In the conversation with the Chief, Dilios told him that it was his intention that the boys should learn the business and eventually take it over. The Chief admitted in cross examination that during the three and one half month period from November 1957 to February 1958, Dilios said William was a good boy and that he was proud of him. The Chief testified that Dilios was not in good physical shape during this period.
In approaching the issue of undue influence, we may well ask ourselves several questions. Was there proof of facts from which the presiding justice could draw inferences and reach a conclusion, based upon the ordinary experience of mankind, that the will of Christos Dilios was obtained by undue influence? Was there proof of facts giving rise to a logical inference on the part of the presiding justice that undue influence was present at the time Christos Dilios executed the instrument purporting to be his last will and testament? Was there proof of facts from which the presiding justice could properly infer and conclude that the mind of Christos Dilios at the time he executed the instrument now before us for interpretation was not free and untrammelled?
Unless the decrees of the presiding justice of the Supreme Court of Probate are clearly erroneous, there is no other course for us to follow except to overrule the exceptions and affirm the decrees.
This is the admonition given us by Rule 52(a), M.R.C.P. which reads in part as follows:
"Findings of fact shall not be set aside unless clearly erroneous, (emphasis supplied) and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."
As pointed out in the very recent decision of Harriman v. Spaulding, 156 Me. 440, 165 A.2d 47, this rule now spells out in definite and positive language the applicable standard previously set forth in a long line of decisions of this court, and applies to findings of a single justice sitting in the Supreme Court of Probate. See Chabot & Richard Company v. Chabot, 109 Me. 403, 84 A. 892; Ayer v. Androscoggin & Kennebec Railway Company, 131 Me. 381, 163 A. 270; Flagg v. Davis, 147 Me. 71, 75, 83 A.2d 319; Waning, Applt., 151 Me. 239, 252, 253, 117 A.2d 347; Everett v. Rand, 152 Me. 405, 407, 131 A. 2d 205; Ray v. Lyford, 153 Me. 408, 140 A.2d 749.
Now, what of the proven facts which were before the presiding justice for his consideration?
We find a situation where it is admitted that the bringing to this country of the two sons of the testator represented the culmination of a life long dream; that his happiness knew no bounds upon their arrival; and yet within the short period of a few months after their arrival he turned against them to such an extent that he first disinherited the older son and shortly thereafterwards, took the same course in reference to his younger son.
There was ample evidence in the record to authorize the presiding justice to find that the trouble between the father and the sons developed as a result of the machinations of Mrs. Tomuschat, the cashier, in his restaurant. The record indicates that from the very beginning, the older boy made known to his father his objections to the relationship with the cashier, and that later, the younger boy voiced the same objections. There is evidence permitting the presiding justice to find that bitter feeling on the part of the father towards his sons developed as a result of *587 continued accusations made by Mrs. Tomuschat to the father about alleged improper actions on the part of the sons in the restaurant, accusations which were unfounded in fact and which were concocted by Mrs. Tomuschat.
That there was a close relationship between the testator and Mrs. Tomuschat is proved by the evidence of the two boys as well as by the testimony of two friends of the testator.
While illicit relationship between the testator and the person alleged to have exerted undue influence is not enough per se to raise a presumption that a will was procured by undue influence, such a relationship is a fact to be considered along with other facts relating to the question of whether or not a purported will was procured by undue influence.
It is pointed out in 54 Am.Jur., Wills, § 444, that although the existence of an illicit relationship does not of itself justify finding that undue influence was in fact exerted on the testator, that the law recognizes that the difficulty of uncovering undue influence is greatly increased where the persons involved have been in an illicit relationship, and coercion of the testator may be inferred from less evidence where the person charged therewith was in an illicit relationship with the testator.
The testimony of Mrs. Tomuschat and her demeanor upon the witness stand, may well have had a bearing upon the final conclusions of the presiding justice. While there is no evidence in the record to show that she knew that Christos Dilios was executing new wills, it is difficult to believe, in the light of human experience, when her close relationship with the testator was so clearly shown, that she did not know that the testator was executing wills in which he was disinheriting his sons. True, she testified that she had no trouble with the boys and that she did not know their father was having trouble with them. However, the presiding justice did not have to believe her testimony.
Moreover, the presiding justice had for consideration the testimony of the two friends of Dilios, one of whom testified that Dilios told him that he had been going around with Mrs. Tomuschat for 12 or 13 years and had taken the best years of her life, and that he could not put her away because the boys had arrived, and that the real reason for disinheriting the boys was the fact that "they cannot get along with the lady." The testimony of the other witness was to the effect that he was in "big trouble"; that he requested this witness not to ask him any more questions and then started to cry.
While we have seen that the person who is alleged to have exerted the undue influence does not necessarily have to be a beneficiary, there was a basis for an inference on the part of the presiding justice that Mrs. Tomuschat had a motive for the disinheritance of the boys. Not only was she given some property in payment, the will said, for money loaned by her to the testator, a fact left in serious doubt by her own testimony, but she had an expectation of a long period of employment, which without question would cease as soon as either of the boys acquired possession of the restaurant for which possession and ownership previous wills had made provision.
Christos Dilios was in a condition enfeebled by a serious illness when he executed the will of December 31, 1957 and he died a very short time after he executed the instrument which is now before us for consideration. One fact which has a bearing upon the condition of his mind at the time of the execution of the instrument in question, is that although there was no provision for taking care of the younger boy in the instrument, he nevertheless told his close friends that his lawyers were to take care of the boy.
There is no set formula to determine the workings of the human mind. The *588 existence of the mind, its nature, and its operations, can be deduced only from the known conduct of the human being.
Here we find an unnatural and unjust testamentary disposition, and while this does not alone carry the issue of undue influence, along with other circumstances, it may well be sufficient.
We have examined the record with great care. We have been assisted by very excellent briefs filed by counsel for both sides. We arrive at the conclusion that the record indicates that there were facts proven from which the presiding justice could logically infer that when Christos Dilios executed the instrument purporting to be a last will and testament, his act was not that of a mind free and untrammelled.
Two eminent jurists have resolved the issue in similar manner. There were facts proven permitting a finding that Christos Dilios, because of his weakened physical condition and other factors, was a person whose mind could be influenced; and facts proven from which a logical conclusion could be reached that he submitted to the overmastering effect of unlawful influence, such as to invalidate the instrument now purporting to be his last will and testament. The contestants have not sustained the burden of showing that the decrees of the presiding justice of the Supreme Court of Probate upon the issue of undue influence were clearly erroneous.
Having determined that the decrees of the presiding justice below to the effect that undue influence invalidated the instrument purporting to be the last will and testament of Christos Dilios, are well founded in law and in fact, it is unnecessary for us to consider the issue of mistake.
The entry will be:
Exceptions overruled. Decrees below affirmed. Counsel fees and expenses to be awarded to counsel for proponents and contestants, the amount thereof to be fixed by the Probate Court and charged as an expense of the administration of the estate.