EMMA H. ROGERS, Appellant,

In the matter of the proposed will of LYDIA M. DEERING.

Sagadahoc.    Opinion March 13, 1924.

*" Undue influence" as a ground for avoiding a will may be established either by proof or a presumption of law.    It is never to be inferred from opportunity or interest alone.    There must be proof that testator was subjected to some influence destroying his free agency, whatever designing method is pursued to produce such undue influence, and that he was constrained from following or expressing his real, actual will or desire.*

In the instant case there was no direct evidence that any one attempted to induce or influence the testatrix to make the will and codicil as they were made with their respective provisions.

Furthermore there was evidence that the intentions of the testatrix and purposes she had in mind as expressed by her prior to the making of the will, were in accord and harmony with the provisions of the will and codicil.

On exceptions.    Instruments, purporting to be Lydia M. Deering's last will and the codicil thereto, disallowed by the Probate Court in Sagadahoc County, on the grounds that the maker was wanting in testamentary capacity and that the documents were not duly executed, were brought by appeal to the Supreme Court of Probate. The sitting Justice, unadvised by a jury, dismissed the appeal, basing his decision on the finding of undue influence.    Exceptions sustained.

The case is very fully stated in the opinion.

*Frank A. Morey and Edward W. Bridgham*, for appellant.

*William R. Pattangall and Walter S. Glidden*, for appellees.

SITTING:    CORNISH, C. J., HANSON, PHILBROOK, DUNN, DEASY, JJ.

DUNN, J.    After the finding of undue influence a probate appeal, which sought recognition for instruments as a will and codicil, was dismissed.    But the finding lacked the support of evidence.

Lydia M. Deering lived and died at Bath.    As far as alienists were concerned it was shown that, in her advanced age, she was affected

by a mental disorder. The medical men theorized rather subtly in relation to the type of that disorder. And they differed utterly concerning the growth of the malady. The conclusion of the one was general physiological atrophy, which, coming from causes not clearly understood, and emphasized by the blocking and hardening of the arterial system, unnourished her brain until, when she made the instruments, the capacity to will was destroyed. The Probate Court so decided. Furthermore that court found undue execution. The other expert deduced that, though the partitions dividing the woman's sense and thought were thinned, yet she made the papers when mind and memory were adequate, when she was intelligent, perfectly rational, perfectly sane, in the sense that she knew and understood the nature and the consequence of her particular act; that her mind rated higher than one merely competent to function legally. But the question is now foreign to inquiry. The cause therefor is, that, in assigning reasons of appeal, it was seen fit to add: Neither instrument was procured by the exerting of undue influence on the mind of her whose hand signed them. The reason was not defined more specifically.

When the appeal came on for trial, certain grandchildren of the decedent continued in effort to upset the documents, because as heirs and kin they held they should have shares of the estate. They did not seriously contend that there was want of proof of proper execution of either of the proposed papers. But they offered resistance to the issue that Mrs. Deering was of sound mind and possessed of testamentary power. And they affirmatively advanced undue influence, which the proponent, this present excepter, she who was named as executrix, countered. The will, as in convenience it may be called, fell. And the codicil fell too. Unadvised by a jury, the sitting Justice determined that the documents were not expressive of Mrs. Deering's "voluntary wishes, but were the result of influences and solicitations on the part of those especially benefitted, which the testatrix no longer had the mental strength to weigh and withstand." Thus the trial judge reasoned and on this basis reached his conclusion that the instruments be vacated and anulled.

The situation ultimately on the probate side, when the essence of every essential in the record has been extracted, may be formulated in this wise: Does any evidence support the decree? Or, as counsel for the contestants well express it, "Is the decision sustained by any

credible evidence?" Such, and not that the decree is equivalent to a jury verdict, is the recognized test. *Eacott, App't*, 95 Maine, 522; *Costello, App't*, 103 Maine, 324; *Palmer, App't*, 110 Maine, 441; *Gower, App't*, 113 Maine, 156; *Thompson, App't*, 116 Maine, 473; *Cotting, App't*, 118 Maine, 91; *Packard, App't*, 120 Maine, 556.

By undue influence in this class of cases is meant influence, in connection with the execution of the will and operating at the time the will is made, amounting to moral coercion, destroying free agency, or importunity which could not be resisted, so that the testator, unable to withstand the influence, or too weak to resist it, was constrained to do that which was not his actual will but against it.

Undue influence often closely resembles and is near akin to actual fraud. But strictly speaking it is not synonomous with fraud. In the making of a will, undue influence is exerted, where the mind of the nominal maker of the document, in yielding to the dominancy and supervision of another's designing mind, does what otherwise the ostensible actor would not have done. Undue and improper influence, to go a little further, presupposes testamentary capacity. Were there no capacity, there could be no will, and the question of whether or not there was influence would be an idle one. The strength of the person's will, in connection with other facts, may be material in relation to whether an exerted influence became operative, but total incapacity negatives the very suggestion of influence. The influence must arise either from proof or presumption of law. It is never inferred from mere opportunity or interest, though these facts if shown should weigh with other facts. But kindness, entreaty, the offer of inducement to gain the making of a will in one's favor, is legitimate, so long as he who made the will had the free choice to make it or not. And a mother's love, her affection, her desire to reward the dutiful conduct of her child, or the promptings of gratitude may properly actuate the doings of a free and voluntary act, notwithstanding it cuts off the reasonable expectations of others upon the bounty of the one who discarded them; save, to be sure, those rights secured by statute. Where there is understanding, where there is volition, what motived a testator's act, even to pique or hostility, is no matter. So the letters on the law's only too familiar guide-post counsel the passer on his way to this case.

Aged eighty-four years, always physically frail, frugal, simple in tastes and habits, keenly deploring the loss of the devoted and

respected husband some four months dead, infirm or weakened by accident; nervous and depressed, emaciated and restless, thus, with her housekeeper and companion, in that home where the family rallied for many a day, was Mrs. Deering on February 16, 1922; the morrow of the day of her son Frank's burial, and the day of the making of the will.

The Deering was a clannish family. Of boys, as the record shows, there were three; Frank, mentioned before, and Harry and Carroll; Emma was the only daughter. The sons, long since grown to manhood, had living-places not far from the old homestead. They were in business with the father in shipping and ship-building. Emma became Mrs. Rogers. Her house was on the same lot as the mother's.

Before the World War the Deerings were of what in these days would be regarded modest means. That war essentially increased business and gains at the Deering yard. The father was generous with the sons. He gave them freely of the capital stock of the Deering corporation, and he owned all virtually, and afterward held less than any of his sons; the holdings of two of the sons were coequal. The father not only gave no stock to the daughter, who was a merchant's wife, but he earlier bought back the few shares that once were hers, paying par for them, likely a fair price at the time, but not comparable to the value that was theirs later. In 1916, about five years before he died, Mr. Deering made his will. A rich man, as worldly riches count in Maine, the sole provision for the wife was a bequest of. $2,000. Maybe that was mutually agreed by them; Mrs. Deering had $40,000 of her own; in her will the husband was given nothing.

After Mr. Deering's death Mrs. Rogers was perhaps the widow's chief reliance. The contestants said that Mrs. Rogers acquired ascendancy over her mother; that she signed and endorsed certain checks for her; that she advised her mother concerning the discharge of a servant, the sale of the automobile, and the dismissing of the chauffeur; that she directed the mother to practice economy; that she and her brothers being in league, were together consulted by the mother about business affairs; that eventually Mrs. Rogers substantially became paramount over the mother; that her influence controlled the other woman in all material matters; and that under such dominion Mrs. Deering was wrongfully induced to make the will and the codicil, the last to suffice the dual purpose of enriching Mrs. Rogers and placating her brothers. Frank Deering's widow lived

nearby. She did not come to Grandmother Deering's house at all, nor did any of Frank's children, the contestants here, come there, as a usual thing.

On the afternoon of 16 February, 1922, Mrs. Rogers summoned Edward W. Bridgham, Esquire, a Bath lawyer, to the Deering house. He found Mrs. Deering at the house, and Mrs. Rogers, and a neighbor Miss Morse, and Mellie Lermond, the housekeeper and companion. The lawyer testified that Mrs. Deering told him, in reply,of her wish to make a will; saying next, without suggestion, that she was leaving one thousand dollars to each of the two sons, and the rest to her daughter. She said, besides, said he, that she was not giving to Frank's children, but gave no reason for disinheriting them. A draft of will was written and read to Mrs. Deering; it was silent touching the omission of the grandchildren. She approved and signed. Miss Morse, Mrs. Lermond, and the draftsman attested. Mrs. Rogers was told by her mother to take the will and care for it. The lawyer was paid, by Mrs. Deering's direction, from her purse, and he went away.

Eight days later, and on Mrs. Rogers' call, Mr. Bridgham came again. Mrs. Deering, Mrs. Rogers, and Mellie Lermond were there. Miss Morse came in later. And Harry Deering brought a "waiver." The waiver, if signed by her and filed seasonably in court, would formally renounce the provision of the husband's will, and have Mrs. Deering take instead what would fall by devolution of law. R. S., Chap. 80, Sec. 13. Lawyer Bridgham did not prepare this document, but he explained its nature and what it would effect, only to find Mrs. Deering already conversant. Harry testified that he had informed his mother of her statutory privilege. The waiver was signed. Bridgham asked Mrs. Deering how she was to dispose of the additional property that would now be hers and she replied that it should go to Carroll, Harry, and Emma, share and share the same. And he rejoined: "What for Frank's children?" And she answered: "They have enough." Another witness said she put it: "They had a plenty." A pencil draft of codicil, carrying a clause excluding the now contesting grandchildren was written, and read to and accepted by Mrs. Deering. The lawyer accompanied Mr. Harry Deering to his house and typed what was in pencil. Back at Mrs. Deering's, the printed page was read and signed, and substantiated by the same persons who bore witness to the will. The codicil was

gummed to the will, Mrs. Deering remarking, "Stick it on good and solid," and Mrs. Rogers took the united papers to a safety-box.

Two months passed. Mrs. Deering's savings bank books, representing quite all her private fortune, were made joint accounts by the addition of Mrs. Rogers' name. And the mother transferred to the daughter sundry stock certificates, some dividend paying, of the face value of $33,000, received from Mr. Deering's executor. Two months later, on June 15th, 1922, to be exact, the savings accounts were made to Mrs. Rogers alone. There was evidence that Mrs. Deering said that the father had not been as liberal with the daughter as with the sons; that "Emma was of the salt of the earth," and that she, (the mother) "wanted to reward Emma's devotion." It was argued that ridding herself of as much was an act so unnatural, so contrary to the instinct of prudence, and withal so unjust to the doer as to taint the transaction with grave suspicion, and itself to proclaim that Mrs. Deering did not proceed in free action as to this or the previous acts; perhaps remote in relation to those done before but it need not be thus cast aside. Mrs. Deering was not in result condemned to embarrassment, want, or misery. She had remaining: a checking account, amount not stated; she had $20,000 in cash from her husband's estate, and additional property worth approximately $70,000.

On a day in August Mrs. Deering seemingly suffered a slight paralytic stroke. But she recovered strength. In October Mrs. Rogers was on a trip to Washington for a fortnight. Mrs. Deering died December 18, 1922.

Now the determining factor, be it not overlooked, is not that of the mental soundness of Mrs. Deering at the making of either paper, nor is it whether consistent persuasion resulted in testamentary preference, but whether there is evidence upholding the decree that, in truth, undue influence extorted the effect claimed. On that the contestants had the burden. The testimony, elicited on cross-examination, of the scrivener and the two others who subscribed the documents, and that of other disinterested persons, to the end that undue influence did not extort that effect, was unmet. Ensuing argument stressed the whole evidence, the circumstances, and the inferences of the circumstances. There was no direct evidence that effort was made by any one to induce the testatrix to make the will and codicil, or either of them, in their respective forms. There was no circum-

stance, standing by itself even, showing that the will and codicil would not hold good. There was evidence that they were in accord with antecedent intentions, in unison with avowed purposes. No authorities were cited by the contestants, and an independent investigation has not disclosed any, where, on the ground of undue influence as here set up, a will properly executed was rejected as the last expression of a person's testamentary intent.

In the record are nearly 1,100 pages, to say naught of exhibits. The hearing of that volume, and of combining and reconciling it, of assessing accurately the undesigned incidents of particular acts, of weighing the opinions of experts with regard to nervous diseases and pshchotic symptoms, of judging witness by their appearance on the stand, and of deducing the truth or the lack of any special testimony by the coherence or incoherence of the whole, was the difficult task of the Justice who heard this case. He apparently attempted, amid the numerous perplexities of the trial term, to weld together what he considered to be weakness of mind on the part of the testatrix and opportunity and interest on the part of others and to subsume it all as undue influence. And therein, as this court surveys the terrain, he erred; erred, it might be, in that he mistook effect for cause.

It is not to be said that in the record there is evidence tantamount of the outgrowth of an influence which the law denounces as undue.

What of the situation now? Ordinarily a case is sent back to the Supreme Court of Probate with instructions for a decree, and thence is remitted to the Probate Court from which originally it came. Such a course might work injustice in this instance. The contestants won in the appeal court, not on the issue that they won on in the court of first instance, but not at all the less on one that the proponents tendered. The exceptions raise the single point of whether the appellate decision was evidentially upborne. It was not so sustained. The proponent wins and the contestants lose. But there was at least another issue; it concerned testamentary capacity. On this no decision was made, except by way of presupposition. To send the case down, in final determination that the will and codicil be admitted to probate, would be saying in substance that testamentary capacity is now deemed to have had existence, either because it was implied as preceding in the finding which is held erroneous in its really vital aspect, or because the contestants did not themselves reserve exceptions to the presumed background of their favorable decision. And

the doing of either would be to assimilate the position to one possible in playing at cards. That the last decision may not be.indicated at this time is regrettable. But it may not be compatibly with fairness. Hence the mandate will be, simply, that the exceptidns be sustained. The case goes back to the Supreme Court of Probate to stand on the docket as it stood on coming from the Probate Court, the sole question of undue influence since decided.

*Exceptions sustained.*