IN RE WILL OF RUTH M. COX,

ADA B. ROBINSON, APPELLANT.

Cumberland.   Opinion, December 1, 1942.

*Elton H. Thompson,*

*Robert A. Wilson,*

*Walter F. Murrell,* for the appellant.

*Charles H. Shackley,* for appellee.

SITTING: STURGIS, C.J., THAXTER, HUDSON, MANSER, MURCHIE, JJ.

MANSER, J. The will of Ruth M. Cox was allowed after a contest in the Probate Court. Appeal was taken to the Supreme Court of Probate, and following an extended hearing, the appeal was dismissed, thus affirming the action of the Probate Court. The case comes forward upon exceptions which are grouped in three categories:

1. That the statutory requirements as to the execution of the will were not complied with.
2. That there was lack of testamentary capacity on the part of the testatrix at the time of its execution.
3. That the will was procured by the undue influence of Thomas Downs, the principal beneficiary.

There were eighteen exceptions. They are not taken up seriatim, but will all be considered.

As to failure to comply with statutory requirements, exceptions set out that the testatrix never declared the alleged in-

strument to be her will; that she never requested the signatures of the attesting witnesses; that the will was not actually signed by her but by the scrivener without her request for assistance; that there was no signature on the will when two of the witnesses signed it, and that these two witnesses never saw the alleged signature; that none of the witnesses identified their own signatures, the signature of the testatrix, or the will itself.

The testimony of the scrivener, a lawyer of experience as shown by the record, was, in effect, that he was called to the house for the purpose of drafting the will early in the morning, that the testatrix greeted him as he entered and told Mr. Downs and Mrs. Perry (who are beneficiaries) to leave the room, which they did. She said that she had been very negligent about making her will and wanted it attended to. She gave explicit directions and he drafted the will in accordance with her instructions; read it to her and asked her if it was just as she wanted it, and she said it was. He asked if there were any persons in the house who could act as witnesses. She said there were, and at her request they were called in. Upon their appearance, he took a book, laid the will upon it and held it in front of her. He then testified: "She was lying flat on her back, and she took the pen to write her name and I took hold of her hand with my right hand and assisted her with writing her name. Then Mrs. McAfee and Mrs. Ridley and I signed as witnesses."

Later, after testimony developed that there were certain pen scratches over which the name of the testatrix was written, the scrivener, upon being recalled to the stand, testified that they were made by the testatrix with his pen before he took hold of her hand to guide it.

As to the other attesting witnesses, Mrs. McAfee testified in direct examination that she was called down to "sign Mrs. Cox's will"; that she saw Mrs. Cox sign it, or as she later said, "I saw Mr. Gould help her sign the will." She also testified that she, Mr. Gould, Mrs. Ridley and Mrs. Cox were all in the room at the same time.

Mrs. Ridley testified that she was called to sign the will; that Mr. Gould, Mrs. McAfee, Mrs. Cox and herself were the only ones in the room; that she saw the testatrix sign her name, and all three were there when she signed it; that she had to wait a little while until Mr. Gould finished up his writing; that she signed her name and Mrs. McAfee signed hers, too.

It is true that the two women witnesses, after having given the testimony summarized above, were further examined at length, principally in cross examination, and there appears to be some confusion in their testimony as to the order of events. For illustration, Mrs. McAfee was asked whether she and Mrs. Ridley signed the will, and after answering affirmatively, was asked as to what then happened and said, in effect, that when the witnesses had signed the will, she saw Mrs. Cox sign, and then went up to her own apartment. Mrs. Ridley, in cross examination, testified that she waited for Mr. Gould to finish up his writing; that he then gave her the pen and she signed the will and Mrs. McAfee signed it. The question was then asked her:

"Q. Then what did he do?
A. Well, I couldn't tell you.
Q. Did he take it to the bed for her to sign?
A. He did."

It appears evident that the presiding Justice did not agree that the literal import of the questions and answers should be accepted as negativing the previous testimony.

Whether the cross examination was artful or sincere, whether these old ladies,— one eighty-three and the other in her seventies,— became confused or did not apprehend that they were being interrogated as to the sequence of events,— if that was the actual purpose of the examiner,— still inferences and conclusions from their entire testimony are to be drawn by the fact-finding tribunal, apparent contradictory evidence must be reconciled, if possible, and the resultant decision will

be sustained if there is credible evidence to support it. *Rogers, Appellant,* 123 Me., 459, 123 A., 634.

The underlying purpose of the statute is to grant to a person of sound mind the right to dispose of his real and personal estate by will, in writing, signed by him, or by some person for him at his request, and in his presence, and subscribed in his presence by three credible attesting witnesses, not beneficially interested under said will. R. S., c. 88, § 1. The requirements as to the execution of a will are safeguards. They are intended to prevent fraud and deceit. They have been sanely interpreted by our Court for the purpose intended. They are facts to be proved. When compliance by word or act is found upon credible evidence, specious objections will not be allowed to thwart the validity of the instrument.

Concerning the alleged omission on the part of the testatrix to request the witnesses to attest the will, it does not appear that she actually made a verbal request after she had signed the will herself. There can be no dispute, however, that she sent for the witnesses, that she recognized them when they came in, that both she and the witnesses understood the purpose for which they were in attendance, and that they were acting in accordance with her desire.

This also has application to the alleged failure of the testatrix to make formal publication of the will. Such formality of declaration is not necessary when the attendant circumstances demonstrate that the business of the moment was the making and execution of a will; that by the request of the testatrix the necessary parties were present; that the instrument which the testatrix signed was actually her will; that she knew they were aware of the fact and wished them to attest it. As said in *Goodridge, et als.,* 119 Me., 371, 111 A., 425:

"It is sufficient under the statutes of this State if it appears that she did sign her name to the instrument as her will, that she by words or acts acknowledged it as her instrument in the presence of the subscribing witnesses

either already signed by her, or signed it in their presence, and that the witnesses at her request subscribed to it in her presence."

In *Cilley* v. *Cilley*, 34 Me., 162, our Court said:

"To publish a will requires no set form of words. It is sufficient if it be made to appear, by competent testimony, that the testator was at the time of executing the instrument fully apprised of its contents, that he knew it to be his will, and intended it as such."

The exception based on the ground that there was no testimony that the two women witnesses saw the actual will is also without merit as there is testimony from each one that they actually saw the testatrix sign the will. The law does not require that witnesses shall be cognizant of its contents. The exhibit shows that the will and the attestation were not written on the same sheet of paper, but considering the phraseology "the within will was signed by Ruth M. Cox," there can be no assumption that there had been an intentional or inadvertent removal of the will, without evidence to support it.

In *Dewey* v. *Dewey*, 1 Metcalf 349, 35 Am. Dec., 367, the Court held that it is not required that the testator should sign his name to the will in the presence of the attesting witnesses or that the witnesses should see the very act of signing. The opinion continues:

"The only inquiry, therefore, as it seems to us, is, whether upon the evidence, in the present case, it may be reasonably inferred that the testator signed his name to the instrument, as and for his will, and that he acknowledged that fact to the witnesses, either directly, or by acts equivalent to an acknowledgment."

"The purpose of procuring the attestation of the witnesses was to give effect to the instrument as a valid will. It can hardly be supposed that the testator, who was by

his own active agency procuring the authentication of the instrument by the requisite witnesses, would have omitted the first step necessary to its due execution, viz. the signature by himself."

In the present case, all the witnesses saw the act of signing by the testatrix and the entire situation disclosed acts equivalent to an acknowledgment and to a request for attestation. In *Deake, Appellant,* 80 Me., 50, 12 A., 700, our Court adopts the rule as stated above.

With relation to the claim that the will was not actually signed by the testatrix but by the scrivener, the contestant first cites the general statutory rule of construction, R. S., c. 1, § 6, XX:

"When the signature of a person is required, he must write it or make his mark."

It does not appear that counsel flatly contends that this presents an absolute alternative and that the signature must be written unassisted or else appear by mark only. If so, it runs counter to universal legal procedure and custom in such matters.

The contestant proceeds to challenge the statement of the scrivener that he came to the aid of the testatrix when it appeared that she failed in her endeavor to write her name unassisted. Counsel introduced testimony from a handwriting expert to the effect that the dominant characteristics of the signature were those of the scrivener and she discovered none of the testatrix herself. This witness did not undertake to say, as asserted by counsel, that the signature was without the mental volition of the testatrix. Inspection of the will shows that there was an attempt to form letters and that superimposed thereon appears the name of the testatrix. The characteristics of the handwriting of the scrivener are evident, but the signature definitely does not present the precision and firmness of the chirography of the scrivener as it appears in

the body of the will. The Court below may well have concluded that it was a characteristically assisted signature. The cases cited by the contestant to this point, and particularly *In re. Kearney's Will,* 74 N. Y. Supp., 1045, 69 App. Div., 481, and *Whitsett* v. *Belue,* 172 Ala., 256, 54 So., 677, do not support the contention made, but are in accord with the general line of authority.

The applicable rules are well stated in 68 C. J., Wills, § 291, as follows:

"Signing with Assistance of Another. The signature is not rendered invalid by the fact that another guided the hand of the testator when he signed the will. This is not in violation of a statute requiring the will to be signed at the end thereof, and the extent of the aid does not affect the validity of the signature if the signing is in any degree an act of the testator, acquiesced in and adopted by him. Such act is the testator's own, performed with the assistance of another, and not the act of another done under the authority of the testator; and in consequence a statute providing that every person who shall sign the testator's name to any will by his direction shall subscribe his own name as a witness to such will, and state that he subscribed the testator's name at his request, has no application, and a noncompliance therewith does not affect the validity of the will. In order to uphold the validity of such signature it is not necessary that an express request for the assistance be given. It may be inferred from the circumstances of the case. It is necessary, however, that it should appear that the testator, at the time of requesting or receiving the aid in the signing of the instrument, had the present volition to affix the signature, and was aware and fully cognizant of the details of the instrument of will or testament to which he, by the aid of the other, was affixing his signature. A will is not legally executed if the testator's signature is procured by some one else holding

his hand, and if he is not in a condition to know what is being done."

Judged by these rules, this exception is without merit.

## TESTAMENTARY CAPACITY

Upon the issue of testamentary capacity, there is no claim of general unsoundness of mind, but that the will was made at a time when the testatrix was in a state of extreme debility, was comatose, was near the termination of life and was not able to fully comprehend what she was attempting to do.

The record would warrant the following findings: The testatrix realized that she was in her last sickness. Her physician had arranged for her removal to a hospital. Going to the hospital symbolized to her the final transition stage. She had firmly decided that before such final step became imperative, she would make provision for the distribution of her property as she wanted it to go. She had a fixed purpose to make a will, but in her thought will, hospital and death represented immediate successive steps. The human instinct to cling to life caused her to defer the actual first step as long as possible. Faced with the necessity of being removed to the hospital, she took action. She insisted on first doing what she had in mind. She requested the attendance of a trusted lawyer of her acquaintance in New Hampshire. Failing to procure his services, she of her own volition selected and sent for a nearby attorney who had attended to some legal matters for her over a period of fifteen years. When he arrived, she banished everyone else from the room. According to the narration of the scrivener, she told him exactly what she wanted to do, clearly and intelligently, without suggestion on his part. She was careful even about the spelling of the name of a beneficiary. She had in mind the nature and location of her property. She spoke of cousins whom she did not intend to make beneficiaries.

She had keyed herself to the task and her determination of purpose carried her through to its completion. At the time

the will was drafted and executed, she had taken neither drug nor stimulant. She sent out word to roomers in the house to come and act as attesting witnesses. They related incidents which demonstrated that when the will was being prepared and became ready for signature and attestation, she was mentally alert. She waved to one, recognized both, and spoke of compensation for the service. She tried to write her own name and was apparently relieved to find that she could have the assistance of the scrivener. That she possessed the animus testandi, a mind with intention to properly execute a will, is fairly disclosed. After the attestation of the witnesses, and the task was over, her mind, spirit and body relaxed, and she soon thereafter sank into a semi-coma. She was immediately removed to the hospital, made some conversation on the way and after arrival, but soon lapsed into unconsciousness and died within twenty-four hours. The graphic story of events surrounding the execution of the will tends to establish the testamentary capacity of the testatrix at the time when it was essential that it should be exercised, and warrants the conclusion reached by the Court below.

"The want of capacity, when urged as a ground for invalidating a testamentary act, must relate to the time of the act. Incompetency may exist before or after, and still the will be valid." *Martin, Appellant*, 133 Me., 422 at 428, 179 A., 655, 659.

### UNDUE INFLUENCE

Was there undue influence on the part of Thomas Downs, the principal beneficiary? The situation requires summation. Mrs. Cox had been in failing health for some time and had been regularly visited by a physician for a year, although she continued to manage and direct her affairs until practically the end of her life. She operated a rooming house in Portland. She left no lineal descendants, her nearest relatives being cousins. Thomas Downs, the principal beneficiary, had lived with her for a considerable period of years at Bartlett, N. H., and in

Maine. Both were elderly people, she being sixty-nine at the time of her death, and while the age of Downs is not definitely stated in the record, it appears to approximate hers. Their relationship is not definite. There is no affirmative evidence to show that it was illicit. Downs was not, however, a mere boarder. He looked after the furnace, did household chores and attended to other matters under her direction. A witness for the contestant testified that the testatrix told him she paid Downs regular wages. Another said that from information received from Mrs. Cox, she paid household bills and gave Downs half of the net proceeds. He was evidently more than a mere janitor, but there is no evidence of a fiduciary relationship.

There was some testimony that Downs was more or less addicted to intoxicating liquor; that at such times he was ill tempered and indulged in argument; that the testatrix was averse to such conditions, was somewhat in fear of him on those occasions and expressed the wish to get rid of him. Evidence is lacking that she ever took any affirmative action in that direction, or that the conditions testified to commonly and usually existed.

Arthur Gray, a cousin who was an object of her sympathetic regard because he had experienced financial misfortune and was an invalid, testified for the contestant. He said that his relations with Mrs. Cox had always been friendly, that he had corresponded with her frequently and particularly in the last few years; that he had known of her relationship with Downs for a long time; that he had visited her both at her home in New Hampshire and at her residence in Portland, the last visit being at the Christmas season preceding her death. During that visit she discussed the situation as to Downs and said they had "little spats," that he used to drink quite often, and at times was hard to get along with. This evidence, coming from a man who might well be disappointed when he found he was not a beneficiary, would justify a finding by the presiding Justice that it presented a truthful and unbiased version.

Taken altogether, there is justification for the version that

the two had lived together as long-time members of a household between whom there was some affectionate regard; that Downs at least remained by her consent and volition; that he did not dominate her affairs; that notwithstanding criticism of one by the other at times, yet they got along well enough together; that he was the servitor rather than the master; that he was not the one who insisted upon her making a will. Various relatives expressed concern because she had not done so, and his expressions to them were, in effect, that she would do it only when she felt compelled by circumstances. The record shows little, if anything, even by way of inference, that he undertook to advise her to do so. Neither does it establish fraud, coercion or deception. When she finally made her own decision, he acted under her direction in procuring the attendance of a scrivener. She had in mind Downs as a natural recipient of her bounty after her death, as he had been in her lifetime.

As has been often reiterated, the burden of proof is on the party alleging undue influence. The true test is the effect on the testator's volition. It must be sufficient to overcome free agency, so that what is done is not according to the wish and judgment of the testator. The conclusion of the presiding Justice that the contestant failed in her contention in this respect is sustained. *Barnes* v. *Barnes*, 66 Me., 286; *O'Brien, Appellant,* 100 Me., 156, 60 A., 880; *Wells, Appellant,* 96 Me., 161, 51 A., 868; *Rogers, Appellant,* 123 Me., 459, 123 A., 634.

The will was properly allowed.

*Exceptions overruled.*