**Sandra RUSSO**

v.

**James MILLER, et al.**

**JAYDAN ASSOCIATES**

v.

**Sandra RUSSO.**

Supreme Judicial Court of Maine.

Argued March 7, 1989.
Reargued May 10, 1989.
Decided June 1, 1989.

---

Tom Brand (orally), Portland, for plaintiff.

Andrew J. Doukas (orally), Portland, for defendants.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

WATHEN, Justice.

Following a bench trial, James Miller, Daniel Miller, and Jaydan Associates (hereinafter buyers) appeal from a judgment of the Superior Court, (Cumberland County, *Fritzsche, J.*) entered in favor of seller. The trial justice set aside a conveyance of real estate from Sandra Russo (hereinafter seller) to buyers on the grounds of undue influence. On appeal, buyers argue that the evidence does not support the application of the doctrine of undue influence. Finding no error, we affirm the judgment.

On June 4, 1986, seller instituted suit against James Miller, Daniel Miller, and Jaydan Associates, a partnership consisting of James and Daniel Miller. The complaint alleged *inter alia,* that buyers procured seller's homestead as a result of the exercise of undue influence. Seller requested rescission of the conveyance. Buyers responded with a forcible entry and detainer action against seller in District Court. The complaint alleged that Jaydan Associates held record title to the real property and that seller was a tenant at will who had been personally served with notice to quit. The District Court appointed a guardian ad litem for seller, and buyers removed the action to the Superior Court where the two complaints were consolidated for hearing. After trial, the court set aside the conveyance on the grounds of undue influence and remanded the forcible entry and detainer action to the District Court for entry of judgment in favor of seller. Buyers appeal from this judgment.

The evidence presented at trial may be summarized as follows: In 1958 or 1959, seller's parents purchased property consisting of approximately 12 acres of land in Scarborough. Seller acquired title to the property over ten years ago. A structure, consisting of two rooms and a bath is situated on the property and has served as a residence either for seller's parents or for seller since the property was purchased.

Seller has a long history of psychiatric illness. She was first hospitalized in the early 1960s for post partum depression. Between 1971 and 1988, she was hospitalized seven or eight times for a variety of reasons, including depression, suicide attempts, drug overdoses, and alcohol abuse. She has suffered from fear and depression for at least twenty years and has manifested suicidal tendencies for at least ten years. In 1987, she was diagnosed as a manic depressive personality. Seller's psychiatrist testified that seller's personality structure and coping skills might render her particularly susceptible to a neighbor's plea.

Seller was admitted to Jackson Brook Institute on September 26, 1985 after she had intentionally taken an overdose of Valium and an anti-anxiety medication. During her stay at Jackson Brook, seller met a patient named Barry Salaman with whom she shared certain interests such as animals and nature. Both had always wanted to live on a farm and raise horses. Salaman told seller he knew of a farm "way up north." As a result of those conversations, seller, for the first time, considered selling her property in order to put a down payment on that farm.

Seller was discharged from Jackson Brook on October 9, 1985 and returned home. During the two weeks immediately following her discharge from the hospital, seller was visited four or five times by Marlis Goldschmidt, a neighbor and acquaintance who was aware of seller's psychiatric problems. During one of the visits, Marlis mentioned that she desperately needed to purchase a piece of land. Seller was sympathetic and ultimately agreed to sell Marlis two and one half acres of her property for $5000. Marlis's husband, Donald, worked with James Miller, one of the buyers, in the painting business. In the fall of 1985, James and Daniel Miller formed a real estate partnership known as Jaydan Associates. James Miller discussed his interest in purchasing real estate with Donald and also mentioned the possibility of paying a finder's fee to individuals who suggested land that buyers might purchase. In the meantime, Marlis had sug-

gested to seller that she sell the remaining land to make a "good life" for herself and Salaman had continued to call seller to discuss the possibility of purchasing a farm "up north." Marlis told seller that her remaining land was worth approximately $25,000 to $30,000.

On November 7, 1985, buyers met seller through Marlis and Donald Goldschmidt. James Miller knew that seller had problems and that she had been hospitalized at Jackson Brook, although he didn't realize the extent of her difficulties. Buyers and seller signed a handwritten contract drafted by Daniel Miller the very day they met. Seller set the terms of the sale and insisted that the parties conclude the agreement immediately. The contract reflects a purchase price of $25,000, with $1000 payable upon the signing of the contract and $9000 payable at closing which was to occur on or before December 1, 1985. The balance was payable in monthly installments of $300. The parties also agreed that seller might remain on the property until May of 1986. On November 9, the parties executed a typewritten contract, the terms of which were identical to those in the original contract. The parties closed the transaction on November 15, 1985. After receiving the $10,000 payment, seller gave Salaman $3200 which he told her he needed to make a down payment on the horse farm up state. With the balance of the money she paid off a bank loan, and "blew" the rest. The record does not reflect that Salaman ever acquired a horse farm.

At no point in these transactions did seller consult an attorney, a real estate broker, or an appraiser. In fact, she discussed the sales and the value of the land with Marlis Goldschmidt only. Buyers, on the other hand, were represented by counsel. James Miller testified that at the time of the sale, he believed he was getting "a good fair price" but not "any great buy." Daniel Miller testified that his impression was that the value of the land was $25,000, or perhaps a little more with some work. Counsel for the buyers testified that he did not feel that the deal was outrageous. He also testified that when he acknowledged sell-

er's deed, he had no indication from seller's demeanor, speech, and general appearance that seller was suffering from any disability. When asked, seller told counsel she was signing the deed of her own free will. After the transaction was concluded, buyers paid the Goldschmidts a finder's fee of $500.

In January of 1986, approximately six weeks after the buyers concluded their purchase of the land from seller, they acquired from the Goldschmidts the 2½ acre parcel that the Goldschmidts had purchased from the seller at the end of October. Buyers paid the Goldschmidts $20,000 for that parcel. Buyers testified that they acquired the smaller parcel because it had the road frontage and site distance necessary "to do anything with the land" that they had already purchased from buyer. Buyers put the two parcels together and investigated the prospects for subdividing the entire piece of land. After performing surveys and soil tests and consulting the Town of Scarborough, buyers ascertained that they could divide the land into a maximum of three lots, and only if they satisfied certain conditions. Prompted by a need for capital, buyers sold two acres of the two and one half acre parcel acquired from the Goldschmidts for $34,000 within eight months after they had purchased it. At the end of 1986, buyers entered into a contract to sell the remaining eight acres for $58,000 or $59,000. That deal fell through when the prospective purchasers broke the contract. Since then, buyers have received a more recent offer of $40,000 for the eight acre lot.

The trial justice found that the conveyance of the eight acre parcel from seller to buyer resulted from undue influence. The justice stated as follows:

Ms. Russo, given her longstanding psychological problems, frequent commitments and heavy medication, was subject to undue influence by a combination of the person she met at Jackson Brook, the Goldschmidts, and, to a much lesser extent, James and Daniel Miller. She was the victim of people who had an opportunity and good position to exercise undue influence over her for a clearly improper purpose. The result of this undue influence is dramatically evidenced by the sale of her property for an unusually low price.

The Superior Court set aside the conveyance on the condition that seller pay to buyer $12,000, the value of what the court found seller received from the transaction.

A party asserting undue influence must prove that claim by clear and convincing evidence. In *Taylor v. Commissioner of Mental Health*, 481 A.2d 139, 149–50 (Me.1984). Thus far, claims of undue influence in Maine have arisen in the context of will disputes. In the case of *In re Will of Lydia M. Deering*, 123 Me. 459, 123 A. 634 (1924), we defined the doctrine in the following terms:

By undue influence ... is meant influence, in connection with the execution of the will and operating at the time the will is made, amounting to moral coercion, destroying free agency, or importunity which could not be resisted, so that the testator, unable to withstand the influence, or too weak to resist it, was constrained to do that which was not his actual will but against it.

Undue influence often closely resembles and is near akin to actual fraud. But strictly speaking it is not synonomous with fraud. In the making of a will, undue influence is exerted, where the mind of the nominal maker of the document, in yielding to the dominancy and supervision of another's designing mind, does what otherwise the ostensible actor would not have done. ... The influence must arise either from proof or presumption of law. It is never inferred from mere opportunity or interest, though these facts if shown should weigh with other facts. But kindness, entreaty, the offer of inducement to gain the making of a will in one's favor, is legitimate, so long as he who made the will had the free choice to make it or not.

*Id.* at 461, 123 A. at 636. We have previously identified a number of factors that bear upon the question of undue influence. In the case of *In re Will of Fenwick*, 348

A.2d 12 (Me.1975), we stated that the existence of a confidential relationship between the testator and the individual who allegedly influenced him and the fact that the testator disposed of his property in an unnatural or unexpected manner are "prominent among the circumstances which have been taken as evidence of undue influence." *Id.* at 15. Proof of such circumstances permits an inference of undue influence. *Id.* This inference may be strengthened by evidence of mental infirmity. *In re Record*, 534 A.2d 1319, 1322 (Me.1987). In addition, whether or not the testator had independent legal advice is a factor to consider in evaluating whether the will was the product of undue influence. *In re Longworth*, 222 A.2d 561, 564 (Me.1966).

■ The Restatement of Contracts has comprehensively defined the doctrine as follows:

(1) Undue influence is unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare.

(2) If a party's manifestation of assent is induced by undue influence by the other party, the contract is voidable by the victim.

(3) If a party's manifestation of assent is induced by one who is not a party to the transaction, the contract is voidable by the victim unless the other party to the transaction in good faith and without reason to know of the undue influence either gives value or relies materially on the transaction.

*Restatement (Second) of Contracts* § 177 (1981). We adopt the Restatement formulation and find sufficient evidence to support the application of the doctrine in this case.

■ Essentially, buyers argue that they exercised no influence over seller and that the sale cannot be voided on the basis of influence that may have been exerted by

third persons. In the absence of express findings of fact or any requests for the same, we conclude that the record supports findings (1) that on the basis of the relation between seller and Marlis Goldschmidt, seller was justified in assuming that the Goldschmidts would not act in a manner inconsistent with her welfare, and (2) that the Goldschmidts acted as the undisclosed agents of the buyers.[1] Given the existence of the required relationship between buyers and seller, the record provides evidence of circumstances supporting the Superior Court's assumed finding that the sale was "produced by means that seriously impaired the free and competent exercise of judgment." *Id.* at § 177, comment b. In this regard, the court appropriately considered the unfairness of the sale price, the absence of independent advice and counsel, and the susceptibility of seller as heightened by her mental infirmity. *Id.* Although none of these circumstances standing alone is determinative, taken together, they amply support the judgment of the Superior Court.

The entry is:

Judgment affirmed.

All concurring.

---

1. Subsection 3 of the Restatement does not protect a party to whom the undue influence is attributable under the law of agency. *Id.* at § 175, comment e.