STATE OF MAINE

CUMBERLAND, ss.

STATE OF MAINE
CUMBERLAND. SS
CLERK'S OFFICE

SUPERIOR COURT
CIVIL ACTION

2002 OCT 24  A 9: 13 DOCKET NOS. CV-01-384
CV-01-389

TDW - Cum - 10/24/2002

LANDVEST, INC.,

              Plaintiff

    v.

ROBERT A. LEE,                          ORDER ON MOTIONS
                                        FOR SUMMARY JUDGMENT
              Defendant

-----------------------------------

KENNETH CARDILLO, et al.,               DONALD L. GARBRECHT
                                        LAW LIBRARY

              Plaintiffs

                                        OCT 29 2002

    v.

ROBERT A. LEE, et al.,

              Defendants


Before the court in these consolidated cases are the Cardillo plaintiffs' motion for summary judgment in CV-01-389 and LandVest's motion for partial summary judgment and to join an additional defendant in CV-01-384.

At the outset, LandVest's motion to add William Kourakos as an additional defendant in CV-01-384 is granted. Kourakos has assumed any obligations that Lee may have under his listing agreement with LandVest. Moreover, from LandVest's point of view, Kourakos is the party who orchestrated Lee's announcement that he was rescinding both his sales contract with Cardillo and his listing agreement with LandVest. Kourakos has been an active participant throughout this consolidated litigation. Although Kourakos's counsel argues that joining him would be a "needless

formality," this amounts to a concession that no prejudice to Kourakos has been shown. An amended complaint naming Kourakos shall be served within 21 days.

## Summary Judgment

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. *See Handy Boat Service, Inc. v. Professional Services, Inc.*, 1998 ME 134, ¶16, 711 A.2d 1306, 1310 (construing former Rule 7(d)). The facts must be considered in the light most favorable to the non-moving party. *E.g., Panasonic Communications & Systems Co. v. State of Maine*, 1997 ME 43, ¶10, 691 A.2d 190, 194. Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. *Harkness v. Fitzgerald*, 1997 ME 207, ¶5, 701 A.2d 370, 372.

## Facts for Purposes of Summary Judgment

With only minor exceptions, the material facts with respect to the Cardillo plaintiffs' motion in CV-01-389 and LandVest's motion in CV-01-384 are identical, and the court will therefore consolidate those facts for purposes of its review. Although many of the material facts are disputed, particularly as they relate to the actions of John Saint-Amour, the LandVest broker who handled the listing on the disputed property, the court is obliged for purposes of summary judgment to resolve any factual disputes

in favor of the parties opposing summary judgment. Construed, therefore, in the light most favorable to Lee and Kourakos, the material facts are as follows.

In January 2001 Robert Lee signed an exclusive listing agreement with LandVest to sell his property at 16 Two Lights Terrace in Cape Elizabeth. By its terms, the exclusive listing agreement lasted for one year. Under the listing agreement, LandVest was to be paid 6.5% commission on any sale, but the agreement provided that if Bill Kourakos (Lee's neighbor) put the property under contract within 60 days[1], LandVest's commission would be reduced to 3.25%. This provision was inserted into the contract because Lee had previously informed Kourakos's mother that he would give Kourakos a right of first refusal.

At the time the listing agreement was entered into, Saint-Amour advised Lee that he would contact Kourakos but made little effort to do so. Saint-Amour did not inform Lee that Kourakos had previously criticized Saint-Amour as unethical and unprofessional based on prior dealings that had occurred between Saint-Amour and Kourakos in 1995.

Although he did not learn from Saint-Amour that the property was for sale, Kourakos nevertheless became aware that it was on the market in March 2001. He communicated to Lee and Saint-Amour that he was interested in the property but felt the $880,000 asking price was too high.

In late May 2001, Kenneth Cardillo, who is a licensed real estate broker and also works part time as a psychotherapist, made the first of a series of offers for the property. Notwithstanding Cardillo's status as a real estate broker, he was seeking to

---

[1] There is evidence that this provision was subsequently extended another 60 days but this was not set forth in the parties' Rule 56(h) statements.

3

purchase the property on his own behalf and on behalf of his wife, Paulette Grondin-Cardillo.[2] At the time of Cardillo's first offer Kourakos and Saint-Amour had a conversation in which they discussed that an offer had been made and Kourakos told Saint-Amour that if Lee ever became willing to accept less than his $880,000 asking price, Kourakos would be interested in making an offer on the property. Saint-Amour did not advise Lee of this statement by Kourakos.

On June 5, 2001, after several of his prior offers had been rejected, Cardillo made an offer of $800,000 for the property. Although this is one of the disputed issues in the case, the court accepts for purposes of summary judgment that Saint-Amour orally advised Cardillo that this bid had been accepted before Saint-Amour ever talked to Lee. The following day, on June 6, Saint-Amour spoke to Lee and strongly recommended that he accept Cardillo's $800,000 bid. At that time Lee asked Saint-Amour if Saint-Amour had spoken to Kourakos. Saint-Amour told him that he had and that Kourakos was "not interested" in the property. At that point Lee told Saint-Amour that he would accept Cardillo's $800,000 offer. Lee did not sign the written purchase and sale agreement that Cardillo had submitted, however, because Lee intended to review that with his attorney first.

That same evening Lee contacted Kourakos to advise him that he had agreed to sell the property. In response to Kourakos's query, Lee advised Kourakos that the price was below the original asking price although exact figures were not stated. Kourakos then attempted to reach Saint-Amour to state that he was interested in making an offer.

---

[2] Because only Kenneth Cardillo was a participant in the various transactions and conversations that are the subject of the motions before the court, the court will for simplicity henceforth refer to "Cardillo" in the singular.

Kourakos testified that he received a return voicemail stating that it was too late because the property was under contract.

On June 7 Kourakos ascertained directly from Lee that a written contract had not yet been signed and then called Saint-Amour to make an offer of $810,000. Kourakos has testified that Saint-Amour then told him that a written contract had already been signed (which Kourakos knew was not true) and attempted to discourage Kourakos from making an offer, but Kourakos insisted that his $810,000 offer be communicated to Lee.

On June 7, 2001 Lee met with his attorney, Jeffrey Buhrman, and with Saint-Amour.[3] At that time there was a discussion to the effect that there were now two offers for the property. Although there is contrary evidence, Lee testified that he was not informed at this meeting that his oral acceptance of Cardillo's $800,000 offer was not enforceable or that only a written purchase and sale agreement would be binding. The ultimate course of action recommended by Saint-Amour and agreed to by Lee was that Saint-Amour would contact both Cardillo and Kourakos and give each the opportunity to make their highest and best bids. According to Lee, however, Saint-Amour also emphasized that Lee had already promised to accept the $800,000 offer and stated that if Lee changed his mind, Cardillo could cause serious problems for Lee and LandVest.

Thereafter Saint-Amour contacted both Kourakos and Cardillo and obtained a bid of $850,500 from Kourakos. Cardillo was unhappy and told Saint -Amour to relay back to Lee that as a man of his word Lee should honor his previous acceptance of

---

[3] Buhrman, as it happened, had recently sought counseling from Cardillo in the latter's capacity as a psychotherapist. Buhrman testified that he had attended one session with Cardillo within the preceding several weeks and had then decided not to continue. Buhrman did not disclose his connection with Cardillo to Lee. Nevertheless, defendants have not suggested that there was any communication between Cardillo and Buhrman relating to the purchase of Lee's home. Indeed, no evidence has been offered that Cardillo was aware that Lee was consulting with a lawyer who had been Cardillo's patient.

5

Cardillo's $800,000 offer. This message was in fact relayed by Saint-Amour to Lee, along with the information that Cardillo had at one point threatened legal action against Lee and LandVest. Nevertheless, Cardillo also submitted a bid for $880,000, Lee's original asking price.

On June 8, 2001 Saint-Amour spoke to Lee, and Lee advised Saint-Amour that of the three bids - - Cardillo's $880,000 bid, Kourakos' $850,500 bid, and Cardillo's original $800,000 bid - - Lee had decided to accept Cardillo's original $800,000 bid. Lee testified he chose this course of action because he felt obliged to honor his original verbal acceptance of Cardillo's $800,000 bid.[4]

Cardillo had advised Saint-Amour that if he won the bidding contest, he wanted Lee to execute a purchase and sale agreement that day (June 8), and Saint-Amour therefore made arrangements to have Lee execute the document that day. At that time, Saint-Amour also arranged to have Lee sign an acknowledgment that he had "received, reviewed and rejected" a contract from Kourakos offering $850,500 and a contract from Cardillo offering $880,000.[5]

On June 9 Lee and Kourakos spoke. Lee told Kourakos that he had felt obliged to execute the $800,000 contract because of his prior oral acceptance of that offer, and that he had orally accepted that offer at a time when Saint-Amour had told him that Kourakos was not interested in the property. Kourakos informed Lee that this was not

---

[4] Lee has not suggested that he was influenced in any way by Cardillo's threat of possible legal action.

[5] In fact, Lee had never actually reviewed the contracts submitted by Kourakos and Cardillo accompanying their $850,500 and $880,000 offers. However, it is undisputed that Lee was apprised of the both the $850,500 offer and the $880,000 offer and chose to reject both. It has not been suggested that the terms of the contracts that were not reviewed by Lee are in any way material to this case.

correct and that prior to Cardillo's $800,000 offer, Kourakos had told Saint-Amour he was interested and would submit a bid if Lee came off his $880,000 asking price.

On June 12, 2001, after consulting with a law firm recommended by Kourakos, Lee wrote to the Cardillos to state that because of material misrepresentations made in connection with the purchase and sale agreement executed on June 8, 2001, the agreement was "void and rescinded." He also stated that he had terminated his brokerage agreement with LandVest. He advised Cardillo that if he wished to renew his $880,000 offer, Cardillo should communicate with Lee's attorney.

On June 28, 2001 Lee conveyed the property to Kourakos for $850,500. No commission was paid to LandVest on the sale. The conveyance was expressly made subject to any claims by Cardillo based on the $800,000 purchase and sale agreement that Lee had declared "void" and was also made subject to any brokerage commission claims made by LandVest under its exclusive listing agreement. As part of the conveyance, Kourakos also agreed to indemnify Lee against any claims made by the Cardillos and LandVest.

## Cardillo's Motion for Partial Summary judgment

Cardillo's motion for partial summary judgment is based on the theory that Cardillo is entitled to enforce the written purchase and sale agreement calling for a sale of the property to Cardillo for $800,000.

In opposition to this theory, Lee and Kourakos first argue that any contract between Lee and Cardillo was superceded by a tripartite bidding agreement entered into between Lee, Cardillo, and Kourakos which could not be altered without

Kourakos's agreement and which required Lee to sell the property to the highest bidder during the June 7 auction.[6] There are two fatal problems with this argument.

The first problem is that a contract to sell real property must be written, not oral, and must be signed by the party to be charged. 33 M.R.S.A. §51(4). The written and executed purchase and sale agreement for $800,000 therefore controls over any alleged oral bidding agreement that may have been previously entered into. As Cardillo notes, the case on which Lee and Kourakos rely is distinguishable on this precise issue. *See Forbes v. Wells Beach Casino, Inc.*, 307 A.2d 210, 213, 216 (Me. 1973) ("*Forbes II*").

The second problem with the tripartite agreement argument offered by Lee and Kourakos is that, if there had been a binding auction agreement, Cardillo would have won the property with his $880,000 bid. The contention by Lee and Kourakos that Cardillo was somehow obligated to renew his $880,000 bid after Lee declared the $800,000 purchase and sale agreement void is without merit. If there was a binding auction agreement, Lee's proper course of action was to have accepted Cardillo's $880,000 bid and to have attempted to hold Cardillo to that bid. Lee cannot argue that there was a binding auction agreement and simultaneously contend that he has the right to violate that agreement by giving the property to Kourakos even though Kourakos was not the highest bidder.

Lee and Kourakos also contend that Lee's written purchase and sale agreement should be voided due to Saint-Amour's alleged misrepresentation -- at the time Lee orally accepted Cardillo's $800,000 offer - - that Kourakos was "not interested" in the

---

[6] Lee and Kourakos do not argue that the alleged tripartite bidding agreement postdated the written purchase and sale agreement for $800,000, because Lee did not execute the written agreement until after the alleged tripartite bidding agreement had been reached. They do argue that because Kourakos was a party to the bidding agreement and never agreed to a modification of that agreement, Cardillo and Lee were not legally able to enter a purchase and sale agreement that involved a departure from the alleged tripartite agreement.

property. [7] By the time Lee signed the $800,000 purchase and sale agreement with Cardillo, it is undisputed that Lee was aware that Kourakos was not just interested in the property but had submitted an $850,500 bid. Cardillo argues with some force that Lee therefore could not have justifiably relied on any earlier representations that Kourakos was not interested. However, Lee and Kourakos argue that even though Lee later became aware both that Kourakos was interested and that he had submitted an $850,500 bid, Lee executed the $800,000 purchase and sale agreement because he had already orally accepted the Cardillo offer and felt obliged to keep his word.

For purposes of argument, the court accepts defendants' contention that Lee's subsequent knowledge of Kourakos's bid does not make Lee's reliance on Saint-Amour's alleged prior misrepresentation unjustifiable. Nevertheless, the flaw in defendants' theory is that, even if it is assumed that there are factual disputes with respect to whether the information Saint-Amour conveyed to Lee with respect to Kourakos's lack of interest constituted either a fraudulent or a material misrepresentation, the source of that misrepresentation was not Cardillo but Saint-Amour. Absolutely no evidence has been tendered that Cardillo was aware of any misrepresentation that may have been made by Saint-Amour on this or any other subject. RESTATEMENT, SECOND, CONTRACTS, §164(2)(1981) expressly provides that a contract induced by a misrepresentation on the part of a person who is not a party to the transaction is not voidable if "the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially

---

[7] Other alleged misrepresentations have been mentioned in this case, see Cardillo's statement of undisputed material facts filed February 25, 2002 ¶28, but Lee's opposition to summary judgment relies solely on Saint-Amour's alleged misrepresentation on June 6, 2001 that Kourakos was "not interested" in the property. See Defendants' memorandum in opposition to motion for summary judgment filed March 21, 2002 at 20-22.

9

on the transaction." By entering a purchase and sale contract promising to pay $800,000 and by tending earnest money of $40,000, Cardillo has given value in this case. *See* RESTATEMENT, SECOND, CONTRACTS §164(2), comment e and illustration 4.

Moreover, the court does not agree with the argument tendered by Lee and Kourakos that Saint-Amour should be deemed to be Cardillo's agent so as to make Cardillo responsible for Saint-Amour's alleged misrepresentations. Although Saint-Amour conveyed certain information from Cardillo to Lee at Cardillo's request, the transmittal of information is part of the intermediary's normal role in a real estate brokerage transaction and does not convert Saint-Amour into Cardillo's agent. Nor does the court accept Lee's argument that LandVest was a party to the purchase and sale agreement, allowing Lee to avoid his obligations to Cardillo based on alleged misrepresentations by Saint-Amour.

Lee's claim that Saint-Amour made fraudulent or material misrepresentations may provide Lee with defenses against LandVest's claim for unpaid commissions and forms the basis for Lee's counterclaims against LandVest but it does not raise any material dispute with respect to Cardillo's motion for summary judgment. This conclusion is only reinforced by the fact that, to avoid the $800,000 purchase and sale agreement based on fraudulent or material misrepresentations, Lee must offer "clear and convincing" evidence. *See Maine Family Federal Credit Union v. Sun Life Assurance Co.*, 1999 ME 43, ¶38, 727 A.2d 335, 345.

Lee's alternative claim of undue influence is similarly unavailing. Assuming, without deciding, that the facts in this case raise a factual dispute as to whether Saint-Amour exercised undue influence over Lee to cause him to orally agree to Cardillo's

$800,000 offer[8] - - leading to a situation where Lee later felt himself bound to spurn the higher offers and execute the $800,000 written contract-- there is no evidence that Cardillo had reason to know of the alleged undue influence exercised by Saint-Amour. *See* RESTATEMENT, SECOND, CONTRACTS §177(3)(1981) (undue influence by a person who is not a party to the transaction does not make the contract voidable if the other party to the transaction gives value in good faith and without reason to know of the undue influence). In addition, while Lee and Kourakos also rely on Buhrman's undisclosed connection to Cardillo as evidence of undue influence, they offer no evidence that Cardillo had any knowledge that Lee was consulting Buhrman, let alone that Cardillo ever attempted to exploit his connection with Buhrman.

The only undue influence that is alleged by Lee and Kourakos to have been known to Cardillo was Saint-Amour's communication to Lee, after Cardillo had been told he was now in a bidding war, that Cardillo thought that if Lee were a man of his word Lee would honor his prior oral contract to sell for $800,000. This appears to have been successful in persuading Lee to sign the $800,000 contract even after higher bids were submitted. However, it does not constitute "unfair" persuasion sufficient to make the contract voidable. *See* RESTATEMENT, SECOND, CONTRACTS §177(1). By transmitting the message that Cardillo thought Lee should adhere to his prior oral acceptance of the

---

[8] Counsel for LandVest stresses that there is also contrary evidence. Indeed, it appears to be undisputed that it was Saint-Amour who proposed that, notwithstanding the prior oral acceptance of Cardillo's $800,000 bid, Cardillo and Kourakos would be informed that there were now competing bids and would be instructed to submit their best and final bids on June 7. For purposes of summary judgment, however, the facts must be construed most favorably to Lee and Kourakos.

11

$800,000 offer, Cardillo did not employ means that seriously impaired the free and competent exercise of Lee's judgment. Id. comment b.[9]

The remaining question is whether there are at least issues of fact precluding Cardillo from being awarded specific performance on Count 1 of the complaint in CV-01-389. Because real property is unique, specific performance is ordinarily awarded. Moreover, it is undisputed in this case that Kourakos was not a bona fide purchaser without notice because he purchased the property with full knowledge of Cardillo's claim and his agreements with Lee specifically anticipate the possibility that Cardillo would successfully pursue his claim. Kourakos's ownership of the property, therefore, is subject to a constructive trust for the benefit of Cardillo and specific performance may be awarded against him.

However, specific performance may nevertheless be denied if a contract is induced by mistake or unfair practices which involve elements of misrepresentation or undue influence even if those elements fall short of what is required to void the contract. See RESTATEMENT, SECOND, CONTRACTS, §364 (1)(a), comment a (1981). The court has carefully considered the record and concludes that there are no disputed facts that preclude an award of specific performance to the Cardillos in this case. As between Lee and Kourakos on the one hand and Cardillo on the other, all equities favor Cardillo even assuming that the disputed facts are construed in Lee's and Kourakos's favor. In this respect, it is highly significant that Lee has always wanted to sell the property in question and persists in that desire today. This is not a case where a seller was unfairly induced to part with property that he wishes to retain. Lee is only unhappy as to the

---

[9] Once again, the conclusion that Lee and Kourakos have not raised disputed issues for trial on their claim of undue influence is reinforced by the "clear and convincing" standard of proof applicable to undue influence claims. See Russo v. Miller, 559 A.2d 354, 357 (Me. 1989).

12

identity of the purchaser and as to the price. As to the identity of the purchaser, however, Lee's desire to sell the property to Kourakos rather than Cardillo is not a factor upon which specific performance may be denied under the circumstances of this case.[10]

As for the purchase price, Lee retains all his remedies against LandVest and Saint-Amour. If, at trial, Lee is able to persuade the trier of fact that Saint-Amour misrepresented and withheld information that resulted in Lee's losing either $50,500 or $80,000 on the sale, the court is not aware of any reason why Lee would not be entitled to relief against LandVest on the counterclaim Lee has asserted against LandVest in CV-01-384. The particular circumstances of this case are (1) that, even construing the facts in Lee's favor, Cardillo is not responsible for any unfairness, (2) that Lee was not induced to sell property he wished to retain, (3) that Kourakos is not a bona fide purchaser without notice, and (4) that Lee retains all his rights against LandVest. The court sees no disputed issue for trial as to whether Cardillo is entitled to specific performance.

However, with respect to Cardillo's claim for special damages in Count 2 of the complaint in CV-01-389, the court finds there are disputed issues of fact as to whether and to what degree Cardillo's additional expenses for a rental house and for storage were offset by any financial benefit he may have received from not having to make mortgage payments because Lee refused to accept his $800,000 bid. Accordingly, Cardillo's motion for summary judgment on Count 2 is denied.

---

[10] This is not a case where, for example, Lee desires to sell the property to a member of his family who grew up living in the residence in question.

13

## LandVest's Motion for Partial Summary Judgment

It follows from the recitation of facts and from the discussion above that the court has concluded that there are disputed issues for trial on LandVest's motion for partial summary judgment on its claim for a brokerage commission from Lee. As Lee points out, LandVest has sought partial summary judgment only on Count 1, which seeks a commission on the $850,500 sale to Kourakos. LandVest has not sought partial summary judgment on its alternative claim in Count 2 for a commission on the $800,000 sale to Cardillo which the court has now found to be valid.

LandVest may be correct that it is entitled to a commission on the sale actually made by Lee and not on the $800,000 contract that is now being enforced through specific performance, but the court is not convinced of that on this record. More significantly, regardless of which sale is involved, Lee has raised sufficiently disputed facts as to whether Saint-Amour breached his fiduciary duty as Lee's broker to require a trial on whether Lee's obligation to pay any commission was discharged. *See Goldberg Realty Group v. Weinstein*, 669 A.2d 187, 190 (Me. 1996).

The entry shall be:

1. For the reasons set forth herein, the Cardillo plaintiffs' motion for partial summary judgment in CV-01-389 is granted as to Count 1 (specific performance) and denied as to Count 2 (special damages). Counsel for the Cardillo plaintiffs shall submit a proposed partial judgment on count 1 within 14 days and counsel for defendants Lee and Kourakos shall have 10 days in which to file any objections to that proposed judgment.

2. For the reasons set forth herein, LandVest's motion to join William Kourakos as an additional defendant in CV-01-384 is granted and LandVest's motion for partial summary judgment in CV-01-384 is denied.

The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

14

Dated:        October 23, 2002

_____
Thomas D. Warren
Justice, Superior Court

15